In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-3228

ELLIOT D. RAY,

*Petitioner-Appellant*,

*v.*

MARC CLEMENTS,

*Respondent-Appellee*.

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 1:07-cv-00190-WCG—**William C. Griesbach**, *Judge.*

ARGUED APRIL 20, 2012—DECIDED NOVEMBER 19, 2012

Before BAUER, MANION, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* In Elliot Don Ray's first federal habeas appeal we found that his constitutional rights were violated when the state introduced out-of-court statements made by individuals who did not testify at his murder trial. But we remanded to give the state the opportunity to assert a defense that Ray's state post-conviction motion was untimely. *Ray v. Boatwright (Ray I)*, 592 F.3d 793, 798-99 (7th Cir.), *as amended* (Apr. 1,

2010). On remand, and after an evidentiary hearing, the district court placed the burden of proving timeliness on Ray, finding that he did not timely give his state post-conviction motion to a prison official for mailing, and dismissed the petition.

On appeal, Ray argues that the district court erred by placing the burden of proof on him, by not requiring the state to put forth an affirmative case of untimeliness, and by not applying the mailbox rule, which supported his position that his state post-conviction motion had been "properly filed" for the purpose of tolling AEDPA's limitations period. The state asserts that the mailbox rule does not apply because the state procedural rule under which Ray challenged his conviction does not have a timeliness requirement, and even if the mailbox rule does apply, the petitioner—not the state—bears the burden of proof, and that Ray did not carry his burden. We disagree and adopt the rule set forth by the majority of our sister circuits that the prisoner mailbox rule governs whether a state post-conviction document is "properly filed" under the AEDPA limitations period unless the state has clearly rejected it. Because Wisconsin has not clearly rejected it, the mailbox rule applies in this case.

Having so found, we address the second issue, which is who has the burden of proof. Where a pro se prisoner's filing is not received by the state court, the habeas petitioner must produce some evidence to support his sworn statement of timeliness, and if this showing is made, the burden shifts to the state to prove untimeliness.

Applying these rules to this case, we find that the state failed to present competent evidence contradicting Ray's testimony and documents showing that he timely gave his state post-conviction motion to a prison official for mailing. The district court's finding of untimeliness was clearly erroneous because it ignored this lack of evidence and was based on nothing more than conjecture and speculative doubt, allowing the state's conclusory arguments to carry the day. We therefore reverse and remand with instructions to grant Ray's habeas petition unless the state elects to retry him within 120 days.

## I.  BACKGROUND

As we detailed more thoroughly in our previous opinion, Ray was convicted in Wisconsin on state counts of reckless homicide, party to a crime, and recklessly endangering the safety of another. *Ray I*, 592 F.3d at 794-96. His conviction resulted from a retaliatory shooting on 29th Street in Milwaukee, Wisconsin that left an eleven-year-old girl dead and two other people injured. At Ray's criminal trial, the state called Detective Daniel Phillips to describe a signed statement that Ray gave during his interview with police. The detective primarily read from Ray's statement. But he also recounted his own out-of-court statements informing Ray that two co-actors had implicated Ray in the shootings. Detective Phillips testified:

> Ray was then confronted with numerous statements made by co-actors that they were present [at the] shooting on 29th Street and so was Ray.

Ray then stated "those stupid niggers shouldn't be talking and they can't talk for me."

When confronted with statements by [Miriam Myles] that Ray was shooting a nine-millimeter on 29th Street [and] in a statement by Sylvester Townsend . . . that Ray had a .45-caliber pistol[,] Ray then said "tell me which gun killed the girl and I'll tell you everything."

Neither Miriam Myles nor Sylvester Townsend testified during Ray's trial. But defense counsel did not object to this incredibly damaging testimony. After his conviction, Ray raised five issues on direct appeal, including a claim that Detective Phillips's testimony violated his right to be confronted with the witnesses against him. The state appellate court ignored this claim, decided that Detective Phillips's testimony was not hearsay because it was not offered to prove the truth of the matter asserted, and affirmed Ray's conviction. The Supreme Court of Wisconsin denied Ray's petition for review on June 12, 2003.

Ray then sought state post-conviction relief under Wisconsin Statute section 974.06. That statute provides: "After the time for appeal or postconviction remedy . . . has expired, a prisoner in custody . . . claiming the right to be released upon the ground that the sentence was imposed in violation of the U.S. constitution . . . may move the court which imposed the sentence to vacate, set aside or correct the sentence." Wis. Stat. § 974.06(1). Importantly, a section 974.06 motion for relief "is part of the original criminal action, is not a separate proceeding

and may be made at any time." *Id.* § 974.06(2). Ray's request for relief under section 974.06 was eventually denied on October 16, 2006.

Ray filed two separate pro se petitions for writ of habeas corpus in the federal district court on February 28, 2007. The district court summarily dismissed Ray's petitions, exercising its authority under Rule 4 of the Rules Governing Section 2254 Cases,[1] finding that Ray did not set forth a cognizable constitutional or federal law claim. But the court granted Ray's request for a certificate of appealability to resolve Ray's confrontation clause claim. On appeal, we held that "the evidence presented by the prosecution delivered to the jury statements by named co-actors, not available for cross-examination, accusing Ray of the very crimes with which he stood charged" and "the evidence was a clear violation of Ray's constitutional right of confrontation." *Ray I*, 592 F.3d at 795-96. The state petitioned for rehearing *en banc*, raising a timeliness defense. We denied the petition, but on April 1, 2010 we issued an amended opinion remanding this case to the district court "so that the government may have an opportunity to develop the record on this issue" because the record contained "no

---

[1] Rule 4 "enables the district court to dismiss a petition summarily, without reviewing the record at all, if it determines that the petition and any attached exhibits either fail to state a claim or are factually frivolous." *Small v. Endicott*, 998 F.2d 411, 414 (7th Cir. 1993). Under this procedure, the government might not learn about the petition until a certificate of appealability is granted.

evidence . . . to support the government's assertion" of untimeliness. *Id.* at 799.

On remand, the district court held a status conference to decide how to proceed. The state did not request additional discovery or alert the district court of any difficulties it had experienced in obtaining relevant evidence. The state filed a motion to dismiss Ray's petition as untimely. Ray countered with a motion for summary judgment. After reviewing the parties' briefs, the district court denied both motions, scheduled an evidentiary hearing, and ordered Ray to testify in support of his claim that "the mailbox rule exception to the statute of limitations defense applies." The court also ruled that Ray bore the burden of proving that his petition was timely.

The record before the district court, as it existed prior to the evidentiary hearing, included Ray's sworn affidavit detailing his claim that on April 27, 2004 he gave his section 974.06 motion to Ms. Tamara Smith, a Diamondback Correctional Facility social worker. Ray averred that he gave Ms. Smith the motion, with prepaid postage, for mailing to the Wisconsin Circuit Court of Milwaukee County. He maintained that Ms. Smith, in turn, gave him two receipts: a "Certificate of Service by Mail" receipt, which he signed, and a "CCA Privileged Correspondence Receipt,"[2] which she signed. Ray's affidavit also described his efforts to obtain information from Ms. Smith regarding the processing of his mail.

---

[2] CCA" refers to Corrections Corporation of America.

On June 1, 2004 and September 9, 2004, Ray wrote letters to Ms. Smith asking her to verify that she sent his section 974.06 motion to the court. He then wrote her a third letter on June 15, 2005, requesting the same information. Finally, according to Ray, after not hearing back from Ms. Smith, he sent a notarized letter to the Milwaukee clerk of court on October 4, 2006 to determine the status of his motion. The court informed Ray that it had no record of his post-conviction motion ever being filed, so he immediately submitted a supplemental pro se motion, which the court denied on October 16, 2006. The pre-evidentiary-hearing record contained no evidence contradicting Ray's sworn testimony.

On July 28, 2011, the district court held an evidentiary hearing. Before beginning, the court clarified that even though the general rule is that the party asserting an affirmative defense, like untimeliness, bears the burden of proving the defense, Ray had invoked an exception to the defense so the burden rested with him to prove that the exception applied. The court noted that Ray "has made the required presentation of sufficient evidence . . . to conclude that he has raised [the mailbox rule] issue. . . . [T]he state disputed it, not based on specific facts but inferentially, they argued that the evidence he has supporting his position is not credible. I have concluded that we need a factual hearing on that." The hearing, according to the court, was conducted to "assess [Ray's] credibility."

The evidentiary hearing began with testimony from Corrections Officer John T. Nedbal. He worked in the library of New Lisbon prison, where Ray was incar-

cerated when he allegedly lost the signed CCA receipt after giving it to the prison library staff for photocopying. Officer Nedbal quoted the library policy as requiring inmates to "identify[] material to be copied," which he understood to mean that inmates were expected to describe precisely what they wanted copied. Officer Nedbal testified that he would "look [] over" the descriptions and instructions provided by the prisoner and then "send it to . . . get their copies," but if he noticed anything "suspicious" about the materials submitted he would talk to the prisoner and contact a supervisor if necessary. Officer Nedbal explained that he was only permitted to "glance" at a prisoner's "legal stuff," so he did not read prisoners' legal materials. He stated that he had "glanced at" the disbursement form Ray provided with his copy request. That form contained a "reason for request section," in which Ray wrote, "Two copies of a Corrections Corporation of America Privileged Correspondence Receipt form."

On cross-examination, Officer Nedbal explained that Ray's copies were, to his knowledge, the first requested copies that had ever been lost during the three years that he worked in the library. He agreed that the only basis for believing that the copies had been lost was Ray's claim that he did not receive them. Other than the "photocopy request," which served as a de facto receipt for prisoners and the prison, Officer Nedbal had no other means of verifying that Ray's original document and requested copies had never been delivered.

Ray then called Lynn Martin to testify. Ms. Martin served as the librarian at New Lisbon since the fall of

2007. She explained that she would have screened the documents that Ray submitted for photocopying and flagged anything that looked suspicious for a supervisor's review. According to Ms. Martin, if the materials "went over to be copied" then she did not notice anything suspicious about them. Ms. Martin admitted that she was not aware of any other prisoner's copies being lost, but she said that the only way the library would know is if the "inmate came and let us know." In her opinion, the prison would not have taken steps to look for the copies—including circulating an internal memo, and interviewing individuals who were responsible for the copying—if Ray's copies had never been made. Ms. Martin stated that she checked the "lost in mail" option on an information request form she received because she believed that the photocopies were made and there was no evidence that Ray actually received them.

During her cross-examination, Ms. Martin explained that she would identify a document as suspicious if it "had someone else's name on it," but she also looked at "various other" indicators of suspiciousness. She said she believed Ray's documents were lost because his request was not flagged as suspicious and he claims to have never received the documents. The prison did not have an internal tracking procedure to verify receipt of requested copies, nor did it require prisoners to sign any type of receipt upon delivery. Looking at library records, Ms. Martin confirmed that an inmate with the initials "A.S." completed Ray's photocopy request on April 19, 2010. Finally, Ms. Martin testified that Ray had previously worked in the library between February and September 2008.

On redirect, Ms. Martin corroborated Officer Nedbal's statement that prisoners were required to detail what they wanted copied, not just the number of copies they were requesting or their preference for how the copies would appear (e.g., double-sided, scaled, etc).

The state solicited testimony from Michelle Highley, a financial specialist at Green Bay Correctional Institution since September 2009. Her responsibilities included maintaining records on inmates' trust accounts. Inmate trust accounts show purchases made during incarceration. Ms. Highley testified that Ray's account did not show any purchases between April 1 and June 14, 2004, so if he sent mail during that period, as he claims he directed Ms. Smith to do, he did not purchase the envelopes or postage from the prison's "commissary." Ms. Highley conceded, on cross-examination, however that Ray might have purchased those items before April 1, borrowed stamps and envelopes from other inmates, or received them by mail from family members. On redirect, Ms. Highley testified that Ray had been transferred to Green Bay Correctional Institution on April 30, 2004 and he had "zero" dollars "cash on arrival." Ms. Highley did not dispute that he might have previously purchased stamps or obtained them by alternative means.

Ray served as the final witness at the evidentiary hearing. He began by reaffirming the veracity of his previously submitted affidavit. He explained that in April 2004 he was incarcerated at the Diamondback Correction Facility in Oklahoma. Diamondback did not have a sepa-

rate system for legal mail; inmates could give legal mail to the prison officials or put it directly in the regular mail. Ray explained that on April 27, 2004 he did not have access to the regular mail system because his prison unit was on "administrative confinement," so prisoners were prohibited from leaving the unit. During lunchtime, Ms. Tamara Smith, one of the prison's social workers, "came in the unit." Seeing Ms. Smith, Ray "stopped eating went upstairs to [his] cell, grabbed [his] . . . manila envelope with [his section] 974.06 [motion] in it and brought it downstairs" to give it to her. After telling Ms. Smith that he needed her to send "legal mail" on his behalf, Ray and Ms. Smith went into "the social worker office" where she proceeded to look through the cabinets before finding and giving Ray two forms to complete. The first form, according to Ray, was a certificate of service by mail. The second was a CCA privileged correspondences receipt, which Ms. Smith allegedly signed.

Ray testified that he had been relying on fellow inmates for help with his legal affairs and that he did not produce the CCA receipt initially because one of those inmates had it when the inmate was transferred to another prison. Ray testified that, relying on the advice of other inmates, he only followed up with Ms. Smith—and not the state court directly—because he was concerned that the court might get irritated and summarily dismiss his petition. Ray allegedly sent Ms. Smith three letters to obtain information about his post-conviction motion, the first on June 1, 2004, the second on September 9, 2004, and the last on June 15, 2005. He retained copies of each.

But after not hearing back from Ms. Smith for nearly two years, Ray decided to contact the state court directly. He claims to have waited so long because he thought there might have been some sort of delay in his mail reaching Ms. Smith: "staff members in other institutions . . . [t]hey get a letter . . . from an inmate, they'll put it to the side until they keep piling up. . . ." So in October 2006, Ray sent a notarized letter to the Circuit Court of Milwaukee County requesting information about the status of his section 974.06 motion. After being informed that no such motion was received or pending, Ray filed a supplemental section 974.06 motion, which the court denied on October 14, 2006. Ray subsequently sent Ms. Smith a letter on November 1, 2006 asking about his original motion and explaining that the court had never received it. He also wrote the warden to complain about Ms. Smith's mishandling of his mail.

According to Ray, after we issued our opinion in April 2010, he began reaching out to try to find the inmate who had his CCA receipt. After finally tracking down the receipt, Ray sought to make copies for himself and his recently retained attorney. However, the prison library failed to deliver his requested copies and did not return his original document. So Ray sought advice from Ms. Martin. She apparently knew about Ray's case because she "call[ed] him down to the library to show" him on "LexisNexis the decision" we issued in April 2010. Ray explained to Ms. Martin that he thought it was extremely important to find the document.

The state confronted Ray with Diamondback's "Communication Mail and Visiting" policy, which had been

in effect during April 2004. Section 6(a) of the policy states: "All inmate mail will be processed through the institutional mailroom. No person, either staff or visitors, is permitted to bring in or take out any mail or article for an inmate." Ray maintained that he could not take mail to the mailroom because his unit was on administrative confinement, and despite the written policy, inmates were allowed to give mail to the prison officials. Although the policy said nothing about receipts for outgoing privileged mail—but it did describe such receipts for "incoming" correspondences—Ray swore that Ms. Smith gave him a receipt for his outgoing mail. Pointing to the prison mail logs to buttress his claim, Ray testified that all outgoing legal mail was supposed to be logged, prisoners do not have access to the mail logs, and the prison refused to produce (or submit into evidence) logs from the relevant dates, including the date he gave his motion to Ms. Smith.

The district court offered both sides an opportunity to make closing arguments. Ray's counsel summarized Ray's evidence and argued that "[f]or the State to prevail in this situation, you have to believe that in October 2006, Mr. Ray had figured out . . . AEDPA and the tolling provisions . . . then began to manufacture evidence in 2006 . . . to deal with the federal petition that had not even been filed assuming that a State petition, which he had just found out had not been received, was going to be denied. It is an extraordinary amount of prescience on the behalf of Mr. Ray who, until recently, did not even have his [general equivalency diploma]."

The state closed by raising a series of questions about Ray's version of the events. It began by refuting a suggestion by Ray's counsel that it had been derelict in obtaining evidence from Diamondback. Counsel explained, "I have made numerous phone calls to CCA . . . [and have been] met with voicemails and unreturned calls for months now. I have done everything that I can think of to do to get more information from CCA on what their policies were."

The state then argued that Ray is "a very bright individual" and "it strains credibility" to believe that he could not understand AEDPA's statute of limitations. Counsel continued, "So I do not think that it is beyond the realm of possibility that . . . Mr. Ray learned of the one year time limit, learned that he had passed it and started with his collateral stuff and then at some point made these letters . . . ." The state's attorney further argued that "it seems incredible" that Ray would give Ms. Smith his section 974.06 motion right before he was going to be transferred to Wisconsin, and that "a Privileged Correspondence form would be given to an inmate in outgoing mail" and "a Certificate of Service . . . would be, you know, full of spelling and grammatical errors." Counsel repeatedly stated that Ray's evidence "does not make a lot of sense," especially "given Diamondback's policy, where it clearly states that mail is not to be given to staff members." Before concluding, the state's attorney reiterated that Ray has "shown through many filings that he is clearly a bright and capable individual" and "I do not think that these supposedly arcane rules of habeas corpus are lost on

him" because AEDPA "is not that complex" and "many prisoners, and certainly Mr. Ray" are capable of understanding the statute. Finally, counsel in closing stated:

> We know only from Mr. Ray that the copies were missing or supposedly missing. We do not know what was copied. No one knows what was copied. The only statement about what was copied comes from Mr. Ray.

> The fact that he transferred between five prisons in however many years and suddenly came upon this form that was some sort of smoking gun that he did not give to his attorney but instead gave to prison officials, I just find all of that incredible.

Hr'g Tr., 113-20, July 28, 2011.

On August 23, 2011, the district court issued an order dismissing Ray's habeas petition as untimely. The court found that "Ray's version of the events concerning the filing of his state motion for post-conviction relief is not credible." The court's decision closely paralleled the state's closing argument. Its findings were based on the following: (1) Ray allegedly gave Ms. Smith his motion "when he knew he was on his way back to Wisconsin in a matter of days"; (2) Ray waited until October 4, 2006, to ask the clerk of the court" for information about his motion; (3) Ray failed to take any action other than sending Ms. Smith "nearly identical" letters; (4) the "somewhat curious" nature of Ray "retain[ing] a copy of a letter he sent only a month after he handed Smith

his motion for postconviction relief, but [he] did not retain a copy of the motion itself"; (5) Ray's certificate of service "bears no signatures, other than Ray's, and appears on plain white paper with no heading or other indication that it is an official prison form . . . [and] [e]ven when compared with the official property request form from Ray's file, which also lacks an institutional heading and contains a grammatical error . . . the certificate looks more like the work product of a prisoner than a prison administration"; and (6) Ray's "knowledge of not only the one-year limitations period for federal habeas petitions, but also the mailbox rule and the rules governing tolling of the one-year period" which was demonstrated by his "two or three boxes of legal materials." Finally, the district court pinpointed Ray's claim that the signed receipt had been lost by the prison:

> [I]t is clear that the document Ray handed CO Nedbal for photocopying could have been a document he created in an attempt to manufacture additional evidence to corroborate his claim that he handed his § 974.06 motion to Ms. Smith on April 27, 2004. The detail in which Ray described the document . . . suggests a purpose beyond a simple request for a thirty-cent disbursement for photocopying. . . . [Nedbal's] signature . . . and acceptance of the document for copying, under the circumstances, cannot be reasonably viewed as proof of what the document was. Having worked in the library himself, Ray would have known as much.

The district court concluded that Ray was not credible, that he did not carry his burden of proving statutory tolling, and that his petition was time barred. Ray appeals.

## II. ANALYSIS

This appeal raises two questions that we have yet to resolve in our circuit: first, whether the mailbox rule applies to toll AEDPA's one-year limitations period when a prisoner delivers a Wisconsin section 974.06 post-conviction motion to a prison official for mailing to the state court; second, if the mailbox rule applies, which party bears the burden of proof on the matter of timeliness when the state court never receives the prisoner's motion. Our review of these unsettled legal issues is *de novo*. *Simms v. Acevedo*, 595 F.3d 774, 777 (7th Cir. 2010). We will then decide if the district court clearly erred by finding that Ray did not give his section 974.06 motion to Ms. Smith on April 27, 2004 and that Ray's federal habeas petition was untimely. *See Bintz v. Bertrand*, 403 F.3d 859, 865 (7th Cir. 2005).

### A.  The Mailbox Rule Applies

In *Houston v. Lack*, the Supreme Court established the "bright-line rule" that a pro se prisoner files a federal notice of appeal, a prerequisite to federal appellate jurisdiction, at the moment the prisoner delivers it to a prison official for mailing to the court. 487 U.S. 266, 275-76 (1988).This rule is colloquially known as the "*Houston*" or "prison" mailbox rule. *Jones v. Bertrand*, 171 F.3d 499,

500 (7th Cir. 1999). The reasons for its existence are manifold.

For starters, pro se prisoners occupy a unique position in litigation. Unlike others, pro se prisoners cannot actively monitor their pending case, they cannot personally travel to the courthouse to ensure that their filings have been timely received, and they cannot freely track their mailings via consistent communication with the court, or the enlisted mail carrier, to determine if anything has gone awry. *See Houston*, 487 U.S. at 270-71. Instead, a pro se prisoner must almost blindly rely on "vagaries of the mail" and the scruples of prison officials. *Id.* at 271. "And if there is a delay the prisoner suspects is attributable to the prison authorities, he is unlikely to have any means of proving it, for his confinement prevents him from monitoring the process sufficiently to distinguish delay on the part of prison authorities from slow mail service or the court clerk's failure to stamp the notice on the date received." *Id.* In short, once a pro se prisoner's filing leaves his hands he loses control over its processing. *Id.*

Additionally, prisons are (or should be) equipped with well-developed administrative procedures for "recording the date and time at which they receive papers for mailing." *Id.* at 275. In light of the inherent prison-prisoner power and information imbalance, prisons should be able to "readily dispute a prisoner's assertions that he delivered the paper on a different date" by referencing "prison mail logs," for example, or other reliable indicators of mailing established and controlled by the prison. *Id.* "The prison will be the only party with access to at

least some of the evidence needed to resolve such questions—one of the vices the general rule is meant to avoid—and evidence on any of these issues will be hard to come by for the prisoner confined to his cell, who can usually only guess whether the prison authorities, the Postal Service, or the court clerk is to blame for any delay." *Id.* at 276.

Finally, the mailbox rule ensures that justice will be properly served. *See Jones*, 171 F.3d at 502. Although not always, our judicial system does recognize the complexity of our prescriptive procedural rules and we oftentimes relax those rigid requirements when a litigant appears in federal court unrepresented. *E.g., Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) ("A document filed *pro se* is to be liberally construed and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." (citation and internal quotation marks omitted)); *Castro v. United States*, 540 U.S. 375, 381-82 (2003) (explaining that federal courts may recharacterize a pro se litigant's filing to avoid "unnecessary dismissal" and the "inappropriately stringent application" of labeling requirements, or to better correspond to the motion's substance and legal basis). We have also taken significant steps to ensure that prisoners' filings are not subject to the unrestrained whims of prison officials. *See* Fed. R. Civ. P. 4(c); *see also United States v. Craig*, 368 F.3d 738, 740 (7th Cir. 2004) ("Today the mailbox rule depends on Rule 4(c) . . . , [which] applies to 'an inmate confined in an institution' . . . . A court ought not pencil 'unrepresented' or any extra word into the text of Rule 4(c)."). The mailbox rule further counterbalances

the heavy weight that our procedural rules have stacked against pro se prison litigants. In a just judicial system, a pro se prisoner's chance of success should not be inextricably tied to his or her understanding and familiarity with the nuance of procedure; it should depend primarily on the substantive merits of the claim being asserted. The mailbox rule facilitates merits adjudication by, under certain circumstances, removing one—but not all—of the complex procedural hurdles standing in the pro se prisoner's way. Because "[n]o matter how far in advance the pro se prisoner delivers his notice to the prison authorities, he can never be sure that it will ultimately get stamped 'filed' on time," the mailbox rule renders this matter inconsequential in the interest of justice. *See Houston*, 487 U.S. at 271.

With the rationale underlying the mailbox rule squarely in our sights, we must decide as a matter of first impression whether the rule applies to a Wisconsin pro se prisoner's section 974.06 post-conviction motion.

AEDPA requires a federal habeas petition to be filed within one year from "the date on which the [state] judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). "The one-year statute of limitations can be tolled, however, if the petitioner applies for 'State post-conviction or other collateral review' of the judgment." *Price v. Pierce*, 617 F.3d 947, 950 (7th Cir. 2010) (quoting 28 U.S.C. §2244(d)(2)). For statutory tolling to apply, the state post-conviction motion must be "properly filed." 28 U.S.C. § 2244(d)(2).

That determination is governed by state procedural law. *Artuz v. Bennett*, 531 U.S. 4, 8 (2000).

Ray filed his federal habeas petition on February 28, 2007. His state conviction became final on or about September 10, 2003, after the time expired for filing a petition for writ of certiorari in the Supreme Court for direct review of the state court's judgment. *See* 28 U.S.C. § 2244(d)(1)(A); *see also Anderson v. Litscher*, 281 F.3d 672, 675 (7th Cir. 2002) ("[W]e believe that the ninety day period during which a petition for certiorari may be filed by a state prisoner falls within the meaning of section 2244(d)(1)(A) for purposes of calculating when the statute of limitations begins to run."). Given the three-year time difference between the state court's final judgment and Ray's federal filing, Ray's federal habeas petition would be time barred absent tolling.[3]

The state, citing Wisconsin Statute sections 801.16(1)

---

[3] Ray has not invoked the doctrine of equitable tolling, which can toll AEDPA's one-year statute of limitations period, but demands that the petitioner demonstrate "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005). The "threshold necessary to trigger equitable tolling is very high" and the doctrine applies only when "extraordinary circumstances" outside of the petitioner's control prevent timely filing. *United States v. Marcello*, 212 F.3d 1005, 1010 (7th Cir. 2000). "Equitable tolling . . . asks whether federal courts may excuse a petitioner's failure to comply with federal timing rules, an inquiry that does not implicate a state court's interpretation of state law." *Holland v. Florida*, ___ U.S. ___, 130 S. Ct. 2549, 2563 (2010).

and 809.80(3), argues that Ray cannot benefit from the mailbox rule because Wisconsin requires "actual receipt" by the court clerk for a document to be "properly filed," and Ray's motion was not actually received before AEDPA's limitations period expired. The state also argues that the mailbox rule should not apply where, as here, a prisoner's post-conviction motion may be filed at any time. The state views section 974.06's failure to include a filing deadline as proof that Wisconsin refuses to apply the mailbox rule in these circumstances. We do not find the state's arguments persuasive.

A majority of our sister circuits have held that unless a state clearly rejects it, the *Houston* mailbox rule governs whether a state post-conviction document is "properly filed" under AEDPA. *Compare Campbell v. Henry*, 614 F.3d 1056, 1059 (9th Cir. 2010) (California), *and Stoot v. Cain*, 570 F.3d 669, 671 (5th Cir. 2009) (Louisiana), *with Howland v. Quarterman*, 507 F.3d 840, 844-45 (5th Cir. 2007) (Texas), *and Vroman v. Brigano*, 346 F.3d 598, 603 (6th Cir. 2003) (Ohio), *and Adams v. LeMaster*, 223 F.3d 1177, 1180 (10th Cir. 2000) (New Mexico). *But see Fernandez v. Artuz*, 402 F.3d 111, 113-15 (2d Cir. 2005) ("New York's rejection of the mailbox rule does not preclude its application by a *federal* court in tolling a *federal* statute of limitations." (emphasis original)); *Anthony v. Cambra*, 236 F.3d 568, 575 (9th Cir. 2000) ("the mailbox rule applies with equal force to the filing of state as well as federal petitions"). Two recent but divergent Fifth Circuit cases illustrate this point. In *Stoot*, the Fifth Circuit held that even though the Louisiana Supreme Court had not considered the precise issue of whether the mailbox rule applies when a pro se prisoner's

pleading is mailed but not received, the state's top court "has adopted the holding and reasoning of *Houston*," so the rule extended to that case. 570 F.3d at 671. *Stoot* is distinguishable from the Fifth Circuit's earlier decision in *Howland* because Texas, the relevant state there, unlike Louisiana, had clearly rejected the mailbox rule. 507 F.3d at 844-45. The thread weaving these disparate outcomes together is the manner in which the underlying state's procedural law treats pro se prisoners' post-conviction filings. *See Artuz*, 531 U.S. at 8. We agree with the majority of our sister circuits and hold that the mailbox rule applies to a state pro se prisoner's post-conviction filings unless the state where the prisoner was convicted has clearly rejected the rule.

Wisconsin procedural law is at issue here, and we think it is clear that Wisconsin has fully embraced the *Houston* mailbox rule. First, Wisconsin does not require "actual receipt" for a post-conviction motion to be deemed properly filed. The state's principal citation, Wis. Stat. § 801.16(1), simply states that court filings "shall be made by filing them with the clerk of circuit court." And Wisconsin Statute section 809.80(3), which says that the court clerk must "receive" a filing before the applicable deadline for it to be "timely," does not apply to pro se prisoners. *See* Wis. Stat § 809.80(3)(e). Instead, a pro se prisoner's petition is filed "on the date that the confined person delivers a correctly addressed petition to the proper institution authorities for mailing," provided that the prisoner files a "certification or affidavit setting forth the date on which the

petition was delivered to the proper institution authorities for mailing." *Id.*

Second, the Supreme Court of Wisconsin made its endorsement of the *Houston* mailbox rule abundantly clear in *State v. Nichols*, 635 N.W.2d 292, 295-96 (Wis. 2001). In that case, the court, persuaded by *Houston*'s rationale, applied the mailbox rule to a pro se prisoner's state certiorari action. *Id.* at 298 ("We are persuaded by the rationale in *Houston*"). It doing so, the court explained that it was not "mandat[ing] any particular procedure that [pro se prisoner] litigants must follow," but "a certificate of service or affidavit of mailing . . . would create a rebuttable presumption that the prisoner had delivered his or her petition to the proper prison authorities on the particular day certified." *Id.* at 299.

The state dismisses *Nichols* because it addressed tolling the time for petitioning the state supreme court for review after an appellate court's affirmance. The state correctly notes that section 974.06 motions are not subject to any time requirements, but this does not matter. All of the concerns animating the Supreme Court's decision in *Houston* and the Supreme Court of Wisconsin's decision in *Nichols* apply with equal force to pro se prisoner filings not subject to a time requirement. A pro se prisoner's unique litigation disadvantages do not disappear when filing deadlines are eliminated. Ray's situation provides a perfect case in point—although he fully complied with section 974.06, the state has attacked his federal habeas petition as untimely. Notwithstanding Wisconsin's generous acceptance of section 974.06

post-conviction motions at any time, there are practical (and in this case drastic) consequences for not filing the motion within one year of the final judgment.

Suppose it was undisputed that Ray gave his post-conviction motion to a prison official within AEDPA's one-year time frame but the state court received the document one year and one day later due to some honest oversight in the prison mail system. Accepting the state's position would leave Ray without a federal forum to collaterally attack his conviction, unless he could prove his entitlement to equitable tolling. Statutory tolling would offer no reprieve because without the benefit of the mailbox rule, Ray's state motion was not "properly filed" within AEDPA's one-year period. The state is comfortable with this result because section 974.06 itself imposes no filing deadline. But we are not. In our hypothetical, Ray's inability to control and monitor his mailings would be the reason for his habeas misfortune. The Supreme Court established the *Houston* mailbox rule to obviate such objectionable outcomes.

The gravamen of the state's argument is that the mailbox rule does not apply where a prisoner's filing is not subject to a timeliness requirement. The state reasons as follows: the mailbox rule applies if there is a filing deadline; Ray could file his state post-conviction at any time, so the mailbox rule does not apply to Ray's filing. We reject this reasoning. Just because a pro se prisoner can benefit from the mailbox rule to statutorily toll AEDPA's one-year period if a state filing is subject to a deadline, it does not follow that the rule cannot apply

where the state imposes no such deadlines. A time limit is only one "condition to filing" that a pro se prisoner must abide to statutorily toll AEDPA with a "properly filed" state post-conviction pleading. *See Allen v. Siebert*, 552 U.S. 3, 6 (2007) ("Whether a time limit is jurisdictional, an affirmative defense, or something in between, it is a 'condition to filing'—it places a limit on how long a prisoner can wait before filing a postconviction petition." (citation omitted)). And the question of whether a petition is "properly filed" remains a matter of interpreting a federal statute. *See Holland*, 130 S. Ct. at 2563. We defer to a state court's interpretation of its own procedural rules out of respect for the principles of federalism. But the absence of state-imposed conditions to filing under state law does not prevent us from recognizing a document as "properly filed" under AEDPA as a matter of federal law. *See, e.g., Sulik v. Taney Cnty*, 316 F.3d 813, 815 (8th Cir. 2003) (holding that *Houston* "applies regardless of the length of the limitation period"); *Lewis v. Richmond City Police Dep't*, 947 F.2d 733, 736 (4th Cir. 1991) (holding that the *Houston* mailbox rule "provides that a statute of limitations has the same practical effect on every pro se prisoner litigant it governs" and "[t]he length of the time restriction involved is irrelevant").

Many courts, including the Supreme Court, have consistently conveyed concerns about the pro se prisoner's unique litigation disadvantage, including his inability to control and monitor documents that he sends to the court. *E.g., Houston*, 487 U.S. at 270-71; *Jones*, 171 F.3d at 500-01. As one means of addressing these concerns,

we will apply the mailbox rule to a prisoner's state post-conviction filings unless the state has clearly rejected the rule. Because the Wisconsin Supreme Court held in *Nichols* that the mailbox rule operates to "file" a pro se prisoner's court document when the prisoner delivers it to a prison official for mailing, that pronouncement governs. *Nichols*, 635 N.W.2d at 298. Ray, therefore, can rely on the *Houston* mailbox rule to statutorily toll AEDPA's limitations period, even though Wisconsin permits section 974.06 post-conviction motions to be filed at any time.

### B. The State Bears the Burden of Proving Untimeliness

Having decided that the *Houston* mailbox rule applies, we turn to the burden of proof. It is well-settled that AEDPA's statute of limitations is a nonjurisdictional affirmative defense. *Day v. McDonough*, 547 U.S. 198, 205 (2006). Generally, the party raising an affirmative defense bears the burden of proof. *See Gildon v. Bowen*, 384 F.3d 883, 886 (7th Cir. 2004). The same is true in the habeas context. *See id.* ("Since the period of limitations is an affirmative defense, the state has the burden of showing that the petition is untimely."). Ray argues that this axiom should end our inquiry, and that the state should bear the burden of proving that his federal habeas petition is untimely. But resolution of this issue is not so straightforward.

The state identifies two potential problems with applying the general rule to this case. First, tolling offers

one way around the statute of limitations and it makes intuitive sense to require the party requesting tolling to prove its appropriateness. The state finds support for this argument in how courts allocate the burden of proof in cases involving equitable tolling. *E.g., Pace*, 544 U.S. at 418. Second, in cases like this one, where a petitioner's purported filing is never received, the state would be required to prove a negative: that the petitioner did *not* give a prison official his petition before AEDPA's one-year limitations period ran. We believe both concerns are overstated.

It is certainly true that the petitioner bears the burden of proving "equitable tolling." *Id.* But equitable tolling, as its name suggests, is an appeal to equity. *See Holland*, 130 S. Ct. at 2563. It is not a matter of statutory interpretation. As is almost always the case, the party seeking equity must prove its entitlement to equity. *See, e.g., Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 233 (2002) (Ginsburg, J., dissenting) ("As courts in the common-law realm have reaffirmed: 'Principles of equity, we were all taught, were introduced by Lord Chancellors and their deputies . . . in order to provide relief from the inflexibility of common law rules.'" (citation omitted)); *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 244-45 (1933) ("The governing principle is 'that whenever a party who, as actor, seeks to set the judicial machinery in motion and obtain some remedy, has violated conscience, or good faith, or other equitable principle, in his prior conduct, then the doors of the court will be shut against him in limine . . . .'" (citation omitted)); *see also Robertson v. Simpson*, 624 F.3d 781, 784

(6th Cir. 2010) ("The party seeking equitable tolling bears the burden of proving he is entitled to it."). Statutory tolling, however, is quite different. Equity is not involved, and blameworthiness is not relevant. *See Holland*, 130 S. Ct. at 2561-62 (describing § 2244(d)(2) tolling as of "a different kind" than equitable tolling). Regardless of how diligent or dilatory a federal habeas petitioner might be, AEDPA's "one-year clock is stopped . . . during the time the petitioner's 'properly filed' application for state postconviction relief 'is pending.'" *Day*, 547 U.S. at 201 (quoting 28 U.S.C. § 2244(d)(2)). Equitable tolling can be invoked only after a finding or concession that the one-year period has expired. *See Cross v. Sisto*, 676 F.3d 1172, 1175-76 & n.2 (9th Cir. 2012). So placing the burden on the party requesting equitable tolling is functionally equivalent to first finding that the federal petition is untimely and then requiring the petitioner to prove that "equity" should except or excuse such untimeliness. In this way, the burden is rightfully on the petitioner, as the party seeking application of an equitable exception to the timeliness rule. *Cf. Knox v. Cook County Sheriff's Police Dep't*, 866 F.2d 905, 907 (7th Cir. 1988) ("While the statute of limitations is an affirmative defense, the burden of establishing an exception thereto is on plaintiff.").

Our section 2244(d)(2) statutory tolling inquiry is one step removed from equitable tolling. It tells us which days count toward the one-year limitations period. As the statute itself puts it, the "time" that a properly filed petition "is pending shall not be counted" toward AEDPA's limitations period. 28 U.S.C. § 2244(d)(2). We

think the state should have to prove that each of the 365 days it relies on for its affirmative defense actually qualifies as a "countable" day under the statute. *See Fleming v. Evans*, 481 F.3d 1249, 1257 (10th Cir. 2007) ("The state bears the burden of proving that the AEDPA limitations period has expired."); *Griffin v. Rogers*, 308 F.3d 647, 653 (6th Cir. 2002) ("[T]he party asserting statute of limitations as an affirmative defense has the burden of demonstrating that the statute has run."). We are particularly persuaded by the fact that a petitioner "cannot bring a federal habeas claim without first exhausting state remedies—a process that frequently takes longer than one year," so Congress, in enacting section 2244(d)(2)'s statutory tolling provision, explained "how the limitations statute accounts for the time during which such state proceedings are pending." *Holland*, 130 S. Ct. at 2562. And "[t]o provide accurate information about prior state court proceedings, most habeas petitioners are forced to rely on state court records . . . , [and it] is not the petitioner, but rather the state that is in the best position to provide this information." *Kilgore v. Attorney Gen. of Colo.*, 519 F.3d 1084, 1088 (10th Cir. 2008); *see also* R. Governing § 2254 Cases 5(d) (requiring a state to file, along with its answer, copies of "the opinions and dispositive orders of the appellate court relating to the conviction or the sentence").

Traditionally, courts have placed the burden of proof on the party in the best position to prove its case. *See, e.g., Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 494 n.17 (2004) ("Among other considerations, allocations of burdens of production and persuasion may

depend on which party—plaintiff or defendant, petitioner or respondent—has made the 'affirmative allegation' or 'presumably has peculiar means of knowledge.' " (citation omitted)). This principle of practicality has roots in common law. *See United States v. Cont'l Ins. Co.*, 776 F.2d 962, 964 (11th Cir. 1985) ("[we adhere] to the common law guide that the party in the best position to present the requisite evidence should bear the burden of proof"). And it just "makes sense to place at least some of the burden on the parties with the best access to the information." *Saleem v. Keisler*, 520 F. Supp. 2d 1048, 1059 (W.D. Wis. 2007). So "all else being equal, the burden [of proof] is better placed on the party with easier access to relevant information." *Nat'l Commc'n Ass'n Inc. v. AT&T Corp.*, 238 F.3d 124, 130 (2d Cir. 2001). In the habeas context, the state is in the best position to prove that the limitations period has run. It will "usually be able to meet this burden by pointing to materials already before the district court, namely, by pointing [to] the petition itself," or by presenting evidence that it can easily access from the prison. *See Griffin*, 308 F.3d at 653.

When questions about AEDPA's statutory tolling arise, many of our sister circuits have employed a "burden shifting" framework requiring the petitioner to make a threshold evidentiary showing before shifting the burden of proof to the state. *E.g., Allen v. Culliver*, 471 F.3d 1196, 1198 (11th Cir. 2006) (per curiam) (requiring petitioner to make a prima facie showing of delivery before shifting the burden to the state); *Caldwell v. Amend*, 30 F.3d 1199, 1203 (9th Cir. 1994) (same); *see also Grady v. United States*, 269 F.3d 913, 916 (8th Cir. 2001) ("[u]nder

our jurisprudence, then, a prisoner seeking to benefit
from the prison mailbox rule must satisfy the require-
ments of Rule 4(c)"). Today, we follow their lead. If the
state raises an AEDPA statute of limitations defense,
the petitioner must come forward with some evidence
to support his claim that, with the benefit of the
*Houston* mailbox rule, 365 countable days have not
elapsed from the time his state-court judgment became
final to the time he filed his federal habeas petition. *See
Allen*, 471 F.3d at 1198. After the petitioner makes this
evidentiary showing, the burden shifts to the govern-
ment to prove that the limitations period has run. *See id.*

The state argues that the burden shifting framework
is inappropriate in cases like this one, where the court
never receives the prisoner's purported filing. The Fifth,
Ninth, and Eleventh Circuits have each confronted this
issue. *See Huizar v. Carey*, 273 F.3d 1220, 1222 (9th Cir.
2001); *Allen*, 471 F.3d at 1198; *Stoot*, 570 F.3d at 671. Not
one has abandoned the burden shifting framework
under similar circumstances. To the contrary, they
each have applied the usual framework, limiting the
petitioner's burden to that of making a threshold evi-
dentiary showing of timely delivery to a prison official
regardless of whether the purported filing was received
by the court. *Allen*, 471 F.3d at 1198. After the
petitioner makes this showing, ordinarily via a sworn
declaration or notarized statement, the burden shifts to
the state to prove untimeliness. *E.g., Huizar*, 273 F.3d
at 1223-24; *Allen*, 471 F.3d at 1198.

In *Huizar*, the petitioner gave prison officials his state
habeas petition for mailing. He wrote to the state court

to get an update about two months later, but received no response. Twenty-one months later, he wrote again. In his second letter, he detailed his previous attempt to file his petition and requested that the court investigate the matter. One month later, the petitioner received the court's response informing him that his petition had never been received. The petitioner then filed a supplemental petition, which the court denied. The case required the Ninth Circuit to decide for the first time whether the mailbox rule "applies if the petition is never received or filed by the court." *Huizar*, 273 F.3d at 1222. The petitioner argued that the "period from the date he gave his first state petition to prison officials . . . to the date it was denied . . . *does not count* toward AEDPA's one-year period." *Id.* at 1223 (emphasis added). Agreeing that *Houston*'s "rationale applies with equal force" in cases where the court does not receive the purported filing, the Ninth Circuit held that "[a] prisoner who delivers a document to prison authorities gets the benefit of the prison mailbox rule, so long as he diligently follows up once he has failed to receive a disposition from the court after a reasonable period of time." *Id.* at 1224. The court found as a matter of law that twenty-one months is "not an unusually long time to wait for a court's decision," but remanded the case to the district court to give the "state . . . the chance to contest" whether the petitioner "handed over his petition" when he claimed to have done so. *Id.*

In *Allen*, the Eleventh Circuit applied the mailbox rule despite the fact that the petitioner's federal notice of appeal was not received by the court. 471 F.3d at 1198.

The court disagreed with the Ninth Circuit's imposition of a diligence requirement because "[o]nce there has been a finding of fact that a timely notice of appeal was in fact delivered to the proper prison authorities . . . , there is no room . . . for the operation of a diligence requirement." *Id.* It remanded the case, however, so the district court could "inquire further as to the actual facts concerning whether . . . a notice of appeal was delivered to the prison authorities." *Id.* In so doing, the Eleventh Circuit explained that "both *Houston* and Fed. R. App. P. 4(c)" suggest that "the burden of proof should be placed upon the state if Allen files a sworn declaration or notarized statement setting forth the date of deposit and attesting that postage had been paid." *Id.* at 1198-99 & n.2.

Notwithstanding the Ninth and Eleventh Circuits' split on the "diligence" requirement, both recognize that *Houston*'s rationale supports placing the burden on the state to prove untimeliness. The Ninth Circuit appealed to the practical disadvantages and fundamental unfairness of putting the burden on the prisoner because "'prison officials may have an incentive to delay prisoners' court filings, and prisoners will have a hard time proving that the officials did so.'" *Huizar*, 273 F.3d at 1223 (quoting *Houston*, 487 U.S. at 270-71). The Eleventh Circuit found those same factors persuasive. *Allen*, 471 F.3d at 1198 n.2 (citing *Houston* for the proposition that prisons have procedures in place and can readily dispute a prisoner's assertions of delivery). We agree that the ultimate burden of proof in these cases should rest with the state because the pro se prisoner occupies a unique disadvantage, and he cannot control

or freely monitor documents that he directs to the court. *See Houston*, 487 U.S. at 275-76. The burden shifting framework we adopt today reflects the state's "superior access to the proof." *Int'l Bros. of Teamsters v. United States*, 431 U.S. 324, 359 n.45 (1977) ("Presumptions shifting the burden of proof are often created to reflect judicial evaluations of probabilities and to conform with a party's superior access to the proof."). It is also consistent with Congress's overarching goals for AEDPA, which includes maintaining federal-state comity, securing the finality of the judicial process, and expeditiously handling habeas proceedings. As the Supreme Court recently made clear, AEDPA's goals are often well served by empowering district court judges with discretion to reach the substantive merits of a habeas petition. *Cf. Day*, 547 U.S. at 208 (holding that "considerations of comity, finality, and the expeditious handling of habeas proceedings" are better served by permitting judges to exercise discretion in each case to decide whether to *sua sponte* dismiss on statute of limitations grounds or reach the merits of the petition).

We pause to address the state's argument that our allocation of the burden in this way would require it to prove a negative. This argument has only superficial appeal. "Proving a negative" suggests requiring the state to do the impossible—that is, to exclude the petitioner's delivery of his filing to a prison official from the realm of all possibility. But the state is not required to prove to a statistical certainty that the petitioner did not hand his document to a prison official on the date that he claims to have done so, and parties are re-

quired to make similar showings all the time in litigation. Indeed, the very merits of a statute of limitations defense depends on a showing that the complainant did "not" file a lawsuit in time. *See, e.g., Kilgore*, 519 F.3d at 1088-89 ("[A] heightened pleading requirement would be inconsistent with other aspects of the habeas scheme, which recognize the practical difficulties petitioners face in bringing their claims."). There can be no doubt that the state is in a better position to show that a prisoner did not give his petition to a prison official for mailing than the prisoner is in to prove that he did. *See Pliler v. Ford*, 542 U.S. 225, 232 (2004) ("[Timeliness] calculations depend upon information contained in documents that do not necessarily accompany the petitions."). As the *Houston* Court emphasized, the pro se prisoner hands his petition "over to prison authorities who have well-developed procedures for recording the date and time at which they receive papers for mailing and who can readily dispute a prisoner's assertions that he delivered the paper on a different date." *Houston*, 487 U.S. at 275-76. The state "will be the only party with access to at least some of the evidence needed to resolve such questions." *Id.* It could, for example, produce "prison mail logs" or present the (likely nonadverse) testimony of the prison official who allegedly handled the prisoner's mail. As for the pro se prisoner confined to his cell, "evidence on any of these issues will be hard to come by" and he can "only guess whether the prison authorities, the Postal Service, or the court clerk is to blame for any delay." *Id.* This is "one of the vices the [mailbox] rule is meant to avoid." *Id.*

We should not forget that it is the state, vis-à-vis the prison, that determines how prison mail is handled in the first place. The state could require its prisons to implement detailed intake and outgoing procedures for prisoner mail, including signatures on receipt, copies of envelopes addressed to the court, or other mechanisms aimed at closely tracking prisoner mail. We see no reason why a prison's failure to institute such procedures should serve to penalize pro se prison litigants. Instead, it reinforces our belief that "the prison [should bear] the burden of showing that the prisoner should not be entitled to the benefits of *Houston*'s dispensation." *See Thomas v. Gish*, 64 F.3d 323, 325 (7th Cir. 1995). This is so because the prison could, if it wanted, adopt these or similar procedures. Its failure to do so leaves the pro se prisoner bearing the risk that his document will be mishandled, but without the means of proving his case. Since it has control over the prison mail policies, control over prisoner mail, and control over the prisoner himself, the state should bear the burden of proving that a pro se prisoner's federal habeas petition is untimely. *See Washington v. United States*, 243 F.3d 1299, 1301 (11th Cir. 2001) (per curiam) ("[A] prisoner's pro se § 2255 motion is deemed filed the date it is delivered to prison authorities for mailing" and "the burden is on prison authorities to prove the date a prisoner delivered his documents to be mailed. Absent evidence to the contrary in the form of prison logs or other records, we will assume [the petitioner's claim is true]."). To the extent the state feels it is tasked with "proving a negative," it can allay

those concerns by implementing procedures to better track and document its prisoners' outgoing mail. *See id.*

The partial dissent (hereinafter the "dissent") suggests that placing the burden on the state is particularly troublesome in this case because the prison policy forbade staff from handling mail for an inmate. (*See post* at 58-59.) But this interpretation of prison policy is simply incorrect. The policy relied upon by the dissent, "All inmate mail will be processed through the institutional mailroom. No person, either staff or visitors, is permitted to bring in or take out any mail or article for an inmate," is more naturally read to mean that mail coming in or out of the prison cannot be delivered through anything *other than the institutional mailroom* (i.e., inmates cannot directly give mail to visitors for placement into a mailbox outside of prison). Furthermore, another provision in the same section of the prison policy expressly provides, "At no time will an inmate/resident be involved in the collection, handling, or distribution of mail," which necessarily means that staff are responsible for collecting or handling inmate mail, likely for security reasons. In any event, the state proffered no evidence to contradict Ray's testimony that he was allowed to give outgoing mail to staff for delivery to the mailroom, which is entirely consistent with the above interpretation.

We recognize the need to identify some limiting principle. Otherwise, as the state correctly points out, a prisoner's purported filing might be "properly filed" or "pending" for years without anyone knowing. To avoid this, we think the petitioner's requisite evidenti-

ary showing should be exacting. The prisoner's sworn declaration should identify the who, what, when, where, how, and why of his alleged delivery to a prison official. And in cases where the purported filing is not received by the court, the petitioner must supply a sworn declaration attesting to these facts *plus* some other corroborating evidence. This "other evidence" can be documentary (for example, copies of the filing, postmarked envelope, or other correspondences). Or, it may be testimonial. But once the pro se prison litigant adduces such evidence, he has done all that is required. The burden then shifts to the state to show untimeliness.

We also reject the Ninth Circuit's "diligence" requirement. We agree with the Eleventh Circuit that a prisoner's lack of diligence cannot operate to unfile a filed document. *See Allen*, 471 F.3d at 1198. And requiring prisoner diligence is inconsistent with the spirit of the *Houston* mailbox rule. The whole point is that the prisoner is *not* at liberty to freely monitor his correspondences from mailing to delivery. How might a prisoner follow up with the court? With additional mailings? If prison officials are dead set on preventing a prisoner from filing court documents, they probably will interfere with the prisoner's ability to diligently follow up on previously sent but not received filings, and if they are completely incompetent the petitioner's follow-up mail will also likely not be delivered. Under either circumstance, the diligence requirement would nullify the rule. We do not accept results so inconsistent with *Houston*.

"[T]he potential for fraud does not justify obligating truthful prisoners to prove that they mailed their [court documents] when the prison authorities do not provide them with means for verification." *Dole v. Chandler*, 438 F.3d 804, 813 (7th Cir. 2006) (exhaustion of state grievance procedures in prisoner § 1983 case). Accordingly, we hold that in cases where the pro se prisoner's post-conviction motion is not received, the petitioner must submit a sworn statement and some evidence to support his claim that he timely delivered the filing to a prison official, but once he satisfies this evidentiary showing, the burden shifts to the state to prove that his federal habeas petition is untimely.

### C. The State Did Not Carry Its Burden

To summarize what we have accomplished so far, the *Houston* mailbox rule operates to "file" a pro se prisoner's state post-conviction motion under AEDPA's statutory tolling provision unless the state has clearly rejected the rule. This rule applies even if the filing is not subject to a deadline under state procedural rules and regardless of whether the petitioner's purported filing is actually received by the court. But if the filing is not received, the petitioner bears the initial burden of identifying (by a sworn declaration in compliance with Fed. R. App. P. 4(c)) the who, what, when, where, how, and why of his timely delivery to a prison official and providing some additional corroborative evidence. Once the petitioner makes this evidentiary showing, however, the burden shifts to the state to prove that the federal habeas

petition is untimely. With these legal issues settled, we now address the merits of Ray's appeal.

The district court found that Ray was "not credible" and that he did not give Ms. Smith his section 974.06 motion on April 27, 2004. It made this determination despite Ray's sworn declaration, live testimony, myriad supporting documents, and the corroborating testimony of two prison employees. The court, adopting the state's argument, dismissed Ray's testimony and evidence as products of an elaborate fraud designed by a "sophisticated" individual to circumvent AEDPA's one-year limitations period.

We review the district court's findings of fact for clear error. *Bintz*, 403 F.3d at 865. "A factual finding is clearly erroneous when, after reviewing the complete record, we are left with the definite and firm conviction that a mistake has been committed." *Holleman v. Cotton*, 301 F.3d 737, 741-42 (7th Cir. 2002) (citation and internal quotation marks omitted). We will reverse if the district court's findings are "implausible in light of the record viewed in its entirety." *Gorham v. Franzen*, 760 F.2d 786, 790 (7th Cir. 1985) (citation and internal quotation marks omitted). But if there "are two permissible views of the evidence, the [district court's] choice between them" will not be disturbed. *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985). The dissent notes that "'[s]pecial deference is given to the district court's factual determinations because the district court had the opportunity to hear the testimony and observe the demeanor of witnesses . . . .'" (*Post* at 61

(quoting *United States v. Smith*, 668 F.3d 427, 430 (7th Cir. 2012)); *see also id.* at 100 ("the district court had the benefit of watching Ray's demeanor . . .").) We agree. But here the district court made no finding concerning Ray's demeanor or presentation, and instead based its "credibility" finding on nothing more than a string of speculative doubts, none of which were based on any competent contradictory evidence presented by the state, as we explain below.

We begin by reviewing Ray's evidence. Before the evidentiary hearing, Ray submitted a sworn declaration describing the who, what, where, where, why, and how of the events that made his filing timely under *Houston*. Ray swore, under penalty of perjury, that he gave his state post-conviction motion to Ms. Tamara Smith, an undisputed prison official, during "lunchtime" on April 27, 2004. He alleged that he gave Ms. Smith his motion "downstairs" in his prison unit and the two proceeded into the "social worker's office" where she searched for, located, and provided him two documentary receipts. He also explained "why" he gave Ms. Smith his motion instead of using the prison mail system: his unit was on administrative confinement and the prisoners had no access to the regular mail system at the time. The dissent asserts, "It is difficult to believe that a prisoner could roam with that much freedom and be able to walk to the social worker's office, but be unable to walk with the social worker to the centrally located mailbox or the prison mailroom." (*Post* at 73.) But this doubt is based purely on speculation about how Diamondback was configured, and what

its specific administrative confinement policies were. Absent actual evidence, it is not implausible to believe that prisoners are entitled to access their social workers during periods of administrative confinement but not the mailroom.

The documents Ray provided corroborated his testimony. He kept and produced copies of the letters he allegedly sent Ms. Smith on June 1, 2004, September 9, 2004, June 15, 2005, and November 1, 2006. He offered a copy of the certificate of service that she allegedly pulled from a cabinet in the social worker's office and gave him to sign after he gave her his post-conviction motion. The dissent emphasizes the discrepancy between Ray's testimony that he filled out the certificate of service form, and other documents in which Ray refers to the certificate of service form as being filled out or signed by Ms. Smith. (*See post* at 70.) But this minor discrepancy does not render Ray's story "so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it." *Anderson*, 470 U.S. at 575. The dissent argues that, "[h]ad [Ray] not changed his story, the State could have shown, through handwriting analysis, that Ray had completed the form." (*Post* at 70.) But it makes no difference who technically filled out that form, so long as it demonstrates that Ray had asked Ms. Smith to mail out his motion.

The typos in the document, and its lack of any distinguishing characteristics like a letterhead, were consistent with other official CCA documents, of unquestioned authenticity, that Ray introduced into evidence bearing the same defects. And no one testified that

Ray's certificate of service was phony. In comparing these forms, the district court "remain[ed] convinced that in both form and content the certificate looks more like the work product of a prisoner than a prison administrator," and the dissent argues that we have improperly substituted our judgment for the district court's. (*See post* at 69.) Such substitution might be improper if the district court had a sound basis for arriving at this conclusion, such as actual testimony about the falsity of the form or the high grammatical standards to which prison forms adhere. But the district court's *only* basis was its own eyeball comparison of the documents, and upon review of the documents on appeal, we conclude that they are not so inherently dissimilar that a factfinder could reasonably conclude that one is a fake, while the other is not.

Although the CCA receipt that Ms. Smith reportedly signed was not in the record, Ray offered an essentially uncontested reason for his failure to produce it: the prison library or mail system lost the document after he gave it to the library staff for copying. The only evidence remotely contradictory was the testimony that this might have been the first time during both Officer Nedbal's and Ms. Martin's tenure that a prisoner's copy request had been lost. But as both Officer Nedbal and Ms. Martin confirmed, the prison would only know if the prisoner reported it to the library staff or some other prison official. So it is certainly possible that Ray's requested copies were not the first to be lost. Even if they were, that fact does not establish an evidentiary basis for finding that Ray manu-

factured the CCA receipt or fabricated a fictitious tale about it. The state could have, but did not, put Ms. Smith on the stand to dispute Ray's claims.

Finally, in addition to offering his own sworn testimony and corroborative documents, Ray presented the testimony of two prison employees, Officer Nedbal and Ms. Martin. While both admitted that they could not be certain that the documents that Ray claims to have been lost were actually lost or contained the original receipt that Ms. Smith allegedly signed, they also testified that prison policy required prisoners to describe in detail the documents they submit for copying and anything "suspicious" would be reviewed by a supervisor. Included on the list of "suspicious" requests were submissions with descriptions that did not match its contents. But no one flagged Ray's submission for review. The testimony of both Officer Nedbal and Ms. Martin lent further credibility to Ray's claim that he had, but lost, a CCA receipt signed by Ms. Smith.

The dissent defends at length the district court's speculative basis for finding that the privilege correspondence receipt was entirely fabricated. (*See post* at 74-89.) The following points of response are in order. First, it takes a speculative leap to go from the mere fact that Ray described the document in the disbursement request form in a lot of detail to the conclusion that he fabricated it. Second, the fact that librarians were not required to affirmatively verify the authenticity of documents to be copied does not create a reasonable inference that the document was therefore a fake or nonexistent. Third, the dissent joins the district court

in critiquing Ray's shortcomings as a pro se litigant, such as Ray's less-than-perfect bookkeeping practices or failure to cite the most convincing pieces of evidence (e.g., the receipt) at specific stages of proceedings (*see also id.* at 94-97 (noting failure to have state motion notarized, failure to notify state court of prison transfers, and failure to retain copies of certain documents)), but that is simply insufficient to jump to the conclusion that the receipt must therefore not exist. Fourth, the dissent finds it incredible that upon obtaining representation, Ray would take it upon himself to track down the receipt, but as any pro bono attorney representing an overly eager prisoner client can attest, that is not so inherently unusual, especially when attorney-client communication is neither quick nor easy when the client is in prison and can be transferred at any time with little notice if any to the attorney, further delaying communication. Last, the dissent argues that it is implausible that Ray would have been able to obtain the receipt which was held by another inmate in another prison in less than 18 days. (*See also id.* at 98-99.) That theory is not without force, but unfortunately for the state, it did not actually produce any evidence to support it.

Ray's sworn declaration, live testimony, documentary evidence, and corroborating witnesses were more than sufficient to shift the burden of proving untimeliness to the state. The state's evidence consisted of two things: Ms. Highley's testimony and the Diamondback Correction Facility's prisoner mail policy. Ms. Highley had no record of Ray purchasing postage during April 2004.

But her knowledge was limited to that specific time frame. She could not rule out the possibility that Ray had retained postage from earlier purchases, borrowed stamps from other prisoners, or received postage from family members or friends who were not incarcerated.[4] The prisoner mail policy added nothing of substance. Although Ray claims to have received a receipt for his outgoing legal mail and the policy does not mention issuance of receipts for such mail, the state did not produce Ms. Smith or some other prison official to counter Ray's testimony that the prison had, and occasionally provided, receipts.

The state did advance a number of arguments at the evidentiary hearing. First, it labeled Ray a "sophisticated" prisoner, with habeas expertise, because he had "boxes" of legal documents. Were these small shoe boxes or large moving boxes? Were they filled with distinct documents or multiple drafts or copies of only a handful unique ones? The record does not say. And unlike the dissent, we do not find it at all inconsistent

---

[4] The dissent asserts that Ray's testimony about postage was "inconsistent" with Ray's affidavit attached to his habeas petition, and that this somehow meant that Ms. Highley's testimony "supported the district court's factual findings." (*Post* at 72.) But the assertion in Ray's affidavit that he gave Ms. Smith a disbursement request is not at all inconsistent with Ray's testimony that he gave Ms. Smith a disbursement request *and* used stamps as postage. In any event, Ms. Highley's testimony simply doesn't support the district court's factual findings as discussed above.

that Ray did not understand the law governing federal habeas corpus when he wrote the state court on October 4, 2006, but then filed a petition in federal court purportedly demonstrating sophisticated knowledge about habeas on November 27, 2006. (*See post* at 90-91.) It is not implausible that Ray would obtain a working knowledge of habeas in two months, especially after the need for such knowledge took on increased urgency when he learned that his state motion was never filed. It is also not at all unusual for pro se filings to contain sophisticated legal arguments, since prisoners routinely rely on templates created by other inmates when filing motions; indeed, Ray testified that he was "relying off inmates to help."

Second, the state accused Ray of concocting a sophisticated scheme in October 2006 to assert a mailbox rule claim and avert AEDPA's one-year time bar. According to the state, Ray made up the whole story about giving his section 974.06 motion to Ms. Smith and receiving two receipts (one signed) from her. He manufactured the certificate of service and the letters that he swears he sent Ms. Smith in order to support his bogus claim. Ray then pursued his mailbox rule strategy in federal court after the state appellate court denied his post-conviction motion. Finally, after we found that his constitutional rights had been violated during his criminal trial and remanded to the district court to give the state an opportunity to rebut Ray's claim of timeliness, Ray tricked the prison staff into believing that they had copied and lost a CCA receipt signed by Ms. Smith.

What the state did not do, however, was present evidence in support of its theory. It did not produce Tamara Smith, nor deny her existence. It is certainly possible that, had she been called, Ms. Smith might have testified that she has no recollection of April 27, 2004. But it is equally likely that she might have flatly denied Ray's account, or—worse for the state—confirmed it. Unfortunately, we can only speculate because the state did not produce her. Nor did the state produce any of Diamondback's former employees to explain if and how the mail policy applied when prisoners were administratively confined, whether receipts were provided for outgoing legal mail, whether prisoners at the facility would have known that they were slated to be transferred to a different prison and the scheduled date of transfer, or whether Ray's supporting documents were fraudulent. And the Diamondback prison mail logs? Not in the record. None of this evidence is in the record. The dissent agrees that the state did not present the above evidence, but notes that the "law does not require direct evidence to prove a fact—circumstantial evidence will suffice." (*Post* at 63; *see also id.* at 63 n.2 (state's "inability to obtain direct evidence of Ray's fraud does not insulate Ray from a finding that he is not credible").) But the state did not even present *circumstantial* evidence upon which a factfinder could have reasonably based his doubts about Ray's testimony.

The dissent argues that, based on Ray's testimony that he was in administrative confinement because "they was bringing Wisconsin prisoners back from Oklahoma back to Wisconsin," the district court "could very rea-

sonably conclude that Ray knew he was returning to Wisconsin while in confinement and that it was strange that he would decide to mail the motion to a Wisconsin court from Oklahoma . . . ." (*Post* at 67-68.) But even if Ray did know that he was returning to Wisconsin (and nothing shows he knew *when* he would be transferred), the fact that a prisoner would want to mail an important state post-conviction motion as soon as it was ready is not so incredible such that the district court could have reasonably discredited his testimony. It is not clear how placing mail destined for a Wisconsin address in a Wisconsin mailbox is so superior to placing it in an Oklahoma mailbox, such that any normal prisoner would obviously delay filing such a critical motion (and consequently, delay his potential release from prison) for an indefinite period of time, just for the opportunity to put that motion in a Wisconsin mailbox.

In sum, the state prevailed in the district court by branding Ray a sophisticated prison litigant and a liar, without any evidence to support those accusations.

We think Ray's counsel hit the nail on the head in his briefs and at oral argument. The state's argument requires us to believe that Ray knew in 2004 that the mailbox rule would apply to a section 974.06 post-conviction motion filed in Wisconsin, even when the motion is not received by the state court—issues that we decide today as a matter of first impression. In 2004, the only circuit authority for applying the mailbox rule to statutorily toll AEDPA were the cases decided by the Ninth Circuit. *E.g., Caldwell*, 30 F.3d at 1203. By that

time, however, the "diligence" requirement was also firmly established in that circuit's law. *E.g., Huizar*, 273 F.3d at 1222. But Ray does not argue that he diligently followed up with the state court during the two years that passed from the time he allegedly gave Ms. Smith his motion to the time he filed his second, supplemental motion. We must also believe that Ray foresaw that neither Ms. Smith nor anyone else from the Diamondback Correctional Facility would testify at the inevitable evidentiary hearing—surely Ray would have known that Ms. Smith's or another CCA official's testimony contradicting his claims likely would have provided evidence to support the district court's dismissal of his petition as untimely. All of this might in fact be true, but without evidence there is no basis for believing any of it.

There is no dispute that the district court placed the burden of proof on Ray. This was error. Our review of the record convinces us that the district court's error was not limited to the law, however. The state did not submit any evidence to contradict Ray's testimony and evidence. And it certainly did not carry its burden of proving that Ray's federal habeas petition was untimely. Yet the district court found that Ray had concocted an elaborate scheme to defraud the court and subvert AEDPA's limitations period, and it concluded that Ray's federal habeas petition was untimely filed. This conclusion lacks an evidentiary basis. We have a "definite and firm conviction" that the district court made a mistake; its findings are clearly erroneous. *See Harris v. Reed*, 894 F.2d 871, 878 (7th Cir. 1990) (finding clear error where the

district court "construct[ed] a trial strategy supporting [petitioner's] counsel's decision" not to call material witnesses at the petitioner's trial); *Gorham*, 760 F.2d at 795 (finding clear error in district court's rejection of evidence related to the petitioner's waiver of his *Miranda* rights because the state failed to "mention[] [the evidence] at the suppression hearing" during the petitioner's trial). The dissent believes that we have "isolate[d] each piece of evidence and then one by one conclude[d] that the individual inconsistency or implausibility is insufficient by itself to support the district court's factual findings" (*post* at 66-67 n.4), but all we have done is demonstrate how the district court discredited each piece of Ray's evidence based not on proof from the state, but on speculation. Speculation piled on top of speculation does not a factual finding make; zero plus zero still equals zero.

Ray's constitutional rights were violated during his criminal trial. There is no dispute about that. After we remanded this case to the district court to decide whether Ray's federal habeas petition was untimely, the state had over one year from the time our mandate issued on April 13, 2010 until the evidentiary hearing. This was more than enough time for the state to cull together evidence sufficient to refute Ray's claim and make a persuasive case for untimeliness. The state apparently "made numerous phone calls to . . . other CCA prisons still operating in Oklahoma" but was met "with voicemails and unreturned calls for months." It did "everything" it could think of "to get more information from CCA on . . . their policies," but was ultimately unsuccessful. So the state appeared at the evidentiary

hearing with one witness, who could only speculate about whether Ray might have had postage in April 2004, and a prison mail policy that did not contradict Ray's testimony about the issuance of receipts for out-going mail. Without evidence, the state painted Ray as a "bright," "sophisticated," and experienced habeas litigant familiar with AEDPA's one-year limitations period and the *Houston* mailbox rule's applicability to a pro se prisoner's purported filing that is not actually received by the court. Branded a liar, what was Ray to do? No amount of evidence could have overcome this hurdle. The district court sided with the state. But it did so only after incorrectly placing the burden of proof on Ray. We previously held that Ray's constitutional rights were violated during his state court trial. So we now reverse the district court's dismissal of Ray's petition as untimely, reinstate the petition, and remand this case with instructions to grant the writ unless the state elects to retry him.

In concluding, we highlight an interesting irony in this case that we think is relevant to our decision to place the burden of proving untimeliness on the state. The state notes the difficulty it has had in obtaining evidence from and about CCA and Diamondback; it was met with unreturned messages for "months." This is the state's attorney's office. Imagine the difficulty, and possible resistance, that a pro se prisoner will likely face under similar circumstances. To ignore this practical reality is to elevate form over substance, procedure over justice. Without a clear statutory command to that effect from AEDPA, and in light of the Supreme

Court's dictates in *Houston*, we reject the state's request that we do so here.

## III. CONCLUSION

For the above-stated reasons, we REVERSE the district court's dismissal of the petition for writ of habeas corpus, and REMAND with instructions to grant the writ unless the state elects to retry the petitioner within 120 days of issuance of our final mandate or of the Supreme Court's final mandate.

MANION, *Circuit Judge*, concurring in part, dissenting in part.

### I.

Ray filed this habeas action in federal court on February 28, 2007. Opinion at 5. The district court denied Ray's petition and he appealed to this court. This court held that Ray's clearly established confrontation clause rights were violated when the state court admitted co-actors' statements through a police detective's testimony at trial. *Ray v. Boatwright*, 592 F.3d, 793, 798 (7th Cir.), *as amended* (Apr. 1, 2010). However, after holding that Ray's constitutional rights had been violated, this court remanded the case to the district court to allow

the district court to determine whether Ray's habeas petition had been timely filed. The government had argued that Ray's habeas petition had been filed after the one-year statute of limitations had run, but Ray had claimed in his habeas petition that the statute of limitations had been tolled because he had handed a state court petition to a prison social worker on April 27, 2004 for mailing. This court concluded that because the district court had dismissed Ray's habeas petition on the merits, before giving the government "an opportunity to answer the petition and develop the record," *id.* at 798-99, remand was required. Specifically, this court explained:

> the government has not yet had a chance to challenge whether the documents Ray placed into the record are authentic; whether the state court petition was ever received by prison officials; whether the papers Ray filed were sufficient under state law to petition for post-conviction relief; or whether the individual to whom Ray allegedly gave his petition was a proper prison authority. Accordingly, we remand this case to the district court so that the government may have an opportunity to develop the record on this issue. If, after the record is fully developed, Ray's petition is determined to be timely, this Court directs the district court to grant the petition for writ of habeas corpus unless the State chooses to retry Ray within 120 days.

*Id.* at 799.

On remand, the district court followed our directive. He held an evidentiary hearing at which Ray testified, along with three state employees (two from the prison library and another involved with prisoner accounts). The documentary evidence Ray presented in support of his claims of timeliness was admitted into evidence, as were prison policies from Diamondback. Following the evidentiary hearing, based on the testimony and documentary evidence, the district court concluded, as a factual matter, that the documents Ray presented were not genuine and that his testimony was not credible. The district court further found that Ray had not given Smith a state post-conviction motion on April 27, 2004 for mailing.

Notwithstanding that the district court did exactly what we directed, the court today holds that the district court's credibility finding and its finding that Ray did not give the motion to a social worker on April 27, 2004 were clearly erroneous. Opinion at 51. I disagree; the district court's factual findings, far from being clearly erroneous, were compelled by contradictions and implausibilities in Ray's story and the documentary evidence. Moreover, while I agree the prison mailbox rule applies (and thus I concur in Part II. A of the opinion), I disagree that the state bore the burden of proving that Ray had not given the purported state post-conviction motion to a social worker on April 27, 2004. However, contrary to the court's conclusion that "after an evidentiary hearing, the district court placed the burden of proving timeliness on Ray," Opinion at 2, the district court did in fact place the burden of proof on the

state and then concluded that the state had met its burden. And that finding was not clearly erroneous. Accordingly, I concur in part and dissent in part.

## II.

### A. Ray bears the burden of proving tolling.

I agree that the state bears the burden of proving the affirmative defense of the statute of limitations. *Gildon v. Bowen*, 384 F.3d 883, 886 (7th Cir. 2004). But the state met this burden. The state established that Ray did not file his federal habeas petition until February 28, 2007, and that this filing was not within the one-year statute of limitations because Ray's state conviction became final on or about September 10, 2003. The state further established that Ray had not filed a state post-conviction petition, which could toll the statute of limitations, until October 2007. Thus, the state proved that Ray's habeas petition was untimely.

It is Ray who is asserting an exception to the statute of limitations and it is he who should bear the burden of proving tolling. While this circuit has yet to address the issue of the burden of proof for tolling under 28 U.S.C. § 2244(d)(2), we have held that the habeas petitioner bears the burden of proving equitable tolling. *Williams v. Buss*, 538 F.3d 683, 685 (7th Cir. 2008). That this case involves statutory tolling and not equitable tolling is of no moment—the same principles apply: The party asserting an exception to the statute of limitations' affirmative defense bears the burden of proving that exception.

*See also Zepeda v. Walker*, 581 F.3d 1013, 1019 (9th Cir. 2009) (stating that the habeas petitioner "bears the burden of demonstrating that the AEDPA limitation period was sufficiently tolled" under § 2244(d)(2)).

In holding that the state bears the burden of proving tolling, the court reasons that "'all else being equal, the burden [of proof] is better placed on the party with easier access to relevant information.' *E.g., Nat'l Commc'n Ass'n Inc. v. AT&T Corp.*, 238 F.3d 124, 130 (2d Cir. 2001)." Opinion at 31. But the court's analysis ignores the re-mainder of what *Nat'l Commc'n* said: "The general rule is that the party that asserts the affirmative of an issue has the burden of proving the facts essential to its claim." *Id.* And "all else again being equal, courts should avoid requiring a party to shoulder the more difficult task of proving a negative." *Id.* In this case, it is Ray who is asserting the affirmative of an issue, namely that he gave Smith a state post-conviction motion on April 27, 2004. The court is thus placing on the state the more difficult task of proving a negative—that Ray did not give Smith the post-conviction motion. Finally, I would note that proving the negative in this context is even more difficult because Ray claims he handed the petition to Smith in violation of the prison policy which stated: "All inmate mail will be processed through the institutional mailroom. No person, either staff or visitors, is permitted to bring in or take out any mail

or article for an inmate."[1] Opinion at 13. No one has been able to find Smith, but if she was part of the prison staff, she would have known she was not permitted to handle prison mail. For these reasons, I dissent from the court's holding that the state bore the burden of proving the statute of limitations was not tolled.

---

[1] The court responds that the more natural reading of this rule is that no one can take mail into or out of the prison. Opinion at 38. But in addition to specifying that the mail must be processed through the mailroom, the procedures also discuss the "posting of outgoing mail," stating that: **"OUTGOING MAIL WILL BE DELIVERED FROM THE INMATE/RESIDENT TO THE FACILITY BY THE FOLLOWING PROCEDURE: The mail clerk will pick up the mail from the centrally located mail box between 8:00 a.m. and 8:30 a.m. Mail will be delivered to the post office the same day it is received by the mail clerk in the Diamondback Correctional Facility mail room."** The policy reiterates this point stating later: "**THE PROCEDURE AT THIS FACILITY FOR COLLECTION OF MAIL IS AS FOLLOWS: Mail will be collected from the centrally located mail box Monday through Friday, (excluding holidays) between 8:00 a.m. and 8:30 a.m."** *See also Policy 16-1* ("Outgoing mail will be posted within 24 hours of the time the mail was turned over to the *facility by the inmate/resident, . . ."* (emphasis added)). Taken as a whole, these procedures clarify that prisoners must deliver outgoing mail to the "facility," and not a staff member, via the centrally located mailbox. No exception is listed for those in administrative confinement even though the policy includes a list of **"ADDITIONAL PROCEDURES AT THIS FACILITY"** related to mail collection.

**B. The district court held that the State bore the burden of proof.**

After concluding that the state bore the burden of proof, the court concludes that the district court wrongly placed the burden of proof on Ray. Opinion at 51. However, the district court's holding on the burden of proof is actually consistent with the court's holding today. The district court did hold that the state did not *initially* carry the burden of proof on tolling. However, the district court also explained that a prisoner claiming the benefit of the mailbox rule had the "initial burden of presenting a sworn declaration setting forth the requirement of having hand[ed] the prison official the document to be filed with postage pre-paid." The district court then agreed with Ray that at that point the burden shifted to the state, stating: "Ray is correct that once the prisoner presents such evidence, as Ray has here, the burden does shift to the respondent to refute it." The district court, though, recognized that there was a split in the circuits on the burden-shifting approach, between the Ninth Circuit's decision in *Huizar v. Carey*, 273 F.3d 1220 (9th Cir. 2001) and the Eleventh Circuit's decision in *Allen v. Culliver*, 471 F.3d 1196 (11th Cir. 2006) (per curiam*)*, but concluded that "regardless of which approach is applied here, the Court finds on the evidence presented that Ray's petition was not filed within the one-year period allowed under § 2244(d)(1)." Thus, the district court did place the burden on the state and the court is wrong to say that "[t]here is no dispute that the district court placed the burden of proof on Ray." Opinion at 51.

### C. The district court did not commit clear error in finding that Ray was not credible and in finding that he had not given Smith a state post-conviction motion on April 27, 2004, for mailing.

Even if the state bore the burden of proof, as this court and the district court held, Ray still cannot prevail because, as discussed below, the district court found, following an evidentiary hearing, that Ray's testimony that he had given a state post-conviction motion to Tamara Smith on April 27, 2004, to mail was not credible. The court holds that the district court committed clear error in finding Ray's testimony incredible and in finding that Ray had not given the social worker a state post-conviction motion on April 27, 2004, to mail.

As the court notes, we will reverse a district court's factual findings only if they are "implausible in light of the record viewed in its entirety." *Gorham v. Franzen*, 760 F.2d 786, 790 (7th Cir. 1985). Moreover, as we recently explained in *United States v. Smith*, 668 F.3d 427, 430 (7th Cir. 2012), "[s]pecial deference is given to the district court's factual determinations because the district court had the opportunity to hear the testimony and observe the demeanor of witnesses . . . ." Thus, because "[d]eterminations of witness credibility are entitled to great deference [they] 'can virtually never be clear error.'" *United States v. Cox*, 536 F.3d 723, 729 (7th Cir. 2008) (quoting *United States v. Blalock*, 321 F.3d 686, 690 (7th Cir. 2003)).

Notwithstanding the extreme deference we owe the district court's credibility and factual findings, the court

concludes that the district court clearly erred. The court justifies its conclusion in four main ways: (1) by stressing all of the evidence the state did not present; (2) by stating that the district court merely branded Ray a liar; (3) by disagreeing with the district court's reasons for finding Ray and his story not credible; and (4) by positing that the state's theory that Ray manufactured the evidence is implausible, or at least that there is no evidence in the record for believing Ray manufactured the evidence.

### 1.   Evidence not presented by the state.

I address first the court's emphasis on the evidence the state did not present. The court first notes that Smith did not testify, Opinion at 49, and then adds:

> Nor did the state produce any of Diamondback's former employees to explain if and how the mail policy applied when prisoners were administratively confined, whether receipts were provided for outgoing legal mail, whether prisoners at the facility would have known that they were slated to be transferred to a different prison and the scheduled date of transfer, or whether Ray's supporting documents were fraudulent. And the Diamondback prison mail logs? Not in the record. None of this evidence is in the record.

Opinion at 49.

It is true that the state did not present this evidence.[2] But the absence of this evidence is entirely irrelevant to the question of whether the district court was clearly erroneous in finding Ray incredible and his evidence and story contradictory and implausible. Yes, Smith or others from Diamondback might have contradicted Ray's testimony, but the law does not require direct evidence to prove a fact—circumstantial evidence will suffice.[3] *See, e.g., Bloedorn v. Francisco Foods, Inc.,* 276 F.3d

---

[2] Diamondback has been closed and the state's attempts to speak with former Diamondback staff have proved futile. Ray's attorney indicated at oral argument that they have not made any efforts to find Smith because it is not their burden. While I disagree with that proposition, *see supra* at 57-59, even assuming the state bore the burden of proof, its inability to obtain direct evidence of Ray's fraud does not insulate Ray from a finding that he is not credible.

[3] The court responds that "the state did not even present *circumstantial* evidence upon which a factfinder could have reasonably based his doubts about Ray's testimony." Opinion at 49. If the court's point is that most of the evidence contradicting Ray's testimony came from Ray himself (and not the state), that objection is misplaced. *See Marantz v. Permanente Medical Group, Inc. Long Term Disability Plan,* 687 F.3d 320, 336-37 (7th Cir. 2012) ("We will not disturb the district court's factual findings after it has weighed the evidence on both sides unless, after considering *all* of the evidence, this court is left with the definite and firm conviction that a mistake has been made.") (emphasis added). If, on the other hand, the court believes that the evidence presented at the hearing does not

(continued...)

270 (7th Cir. 2001) ("An employer's motive is a factual matter which, like any other fact, may be proven by direct or circumstantial evidence."). Moreover, the mail logs the court references, while not produced, would have been completely useless because Ray testified that he did not place the motion in the prison's regular mail system.

### 2. "Branding" Ray a liar.

In addition to highlighting the evidence the state did not present, the court reasoned that: "The state prevailed in the district court by branding Ray a sophisticated prison litigant and a liar, without any evidence to support those accusations." Opinion at 50. That is not so; the district court had ample circumstantial evidence, discussed at length below, to conclude that Ray was both a sophisticated prison litigant and a liar. Thus, contrary to the court's portrayal, this is not a case of the district court merely branding Ray a liar.

It is true, though, as the Supreme Court has made clear, that a court may not "insulate his findings from review

---

³ (...continued)
support a reasonable inference that Ray lied about giving Smith a post-conviction motion, the court is wrong. As discussed below, Ray's testimony, the prison officials' testimony, the Diamondback policies, and the extensive documentation Ray presented to prove his case, taken together created a reasonable inference that Ray never gave Smith a post-conviction motion for filing.

by denominating them credibility determinations . . . ." *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985). But as the Supreme Court further explained in *Anderson*, there are "factors other than demeanor and inflection [which] go into the decision whether or not to believe a witness. Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on [their] face that a reasonable factfinder would not credit [them]." *Id.* That is exactly what we have in this case and precisely what the district court found. The district court stated: "Taking into consideration all of the surrounding facts and circumstances of this case, the Court does not find Ray's testimony that he handed his § 974.06 motion to Ms. Smith on April 27, 2004, credible." The district court further explained it was rejecting Ray's version of events because of "[i]nconsistencies in his own documentation and further implausibilities concerning that documentation . . . ." The district court then detailed a substantial number of inconsistencies and implausibilities, a few of which the court simply mentions without examination or contradiction.

### 3.  The court's disagreement with the district court's reasoning.

As noted, the district court detailed a substantial number of the inconsistencies and implausibilities in Ray's testimony and his evidence. In holding that the

district court committed clear error, the court mentions these reasons but then presents its own view of this evidence, substituting its judgment for the district court's. This is impermissible. *United States v. Mancillas*, 183 F.3d 682, 695 (7th Cir. 1999) ("Factual findings are reviewed for clear error, and this Court will not substitute its judgment for that of the district court if there is support in the record for the trial court's findings of fact.") (internal citations omitted).[4]

---

[4] The court's response to the dissent illustrates two further flaws in the court's review of the district court's reasoning: First, the court quotes *Anderson* out of context to reason that (what the court perceives as) minor inconsistencies or implausibilities in Ray's story cannot support the district court's factual finding because they are not "so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it." Opinion at 43. But in *Anderson*, the Supreme Court was not discussing what was required to *support* a factual finding; rather, the Supreme Court was explaining when a credibility determination *could be overturned* as clearly erroneous. Had the district court found Ray credible, the evidence might not reach the "so internally inconsistent or implausible on its face" threshold to conclude that the district court committed clear error. But in this case the district court found Ray incredible and thus the court's reliance on *Anderson* is misplaced. Second, in concluding that the inconsistencies and implausibilities in Ray's story and his evidence cannot support the district court's factual finding, the court isolates each piece of evidence and then one by one concludes that the individual inconsistency or implausibility is insufficient

(continued...)

### a. Ray's impending transfer to Wisconsin.

For instance, in response to the district court's reasoning that it was curious that Ray gave his Wisconsin state court motion to Smith in Oklahoma for mailing to Wisconsin when he was about to be transferred to Wisconsin, the court retorts: The state did not present any evidence on "whether prisoners at the facility would have known that they were slated to be transferred to a different prison . . . ." Opinion at 49. But Ray testified: "We was on administrative confinement to the unit. We weren't—we weren't allowed to leave the unit. . . . Because they was bringing Wisconsin prisoners back from Oklahoma back to Wisconsin." From this testimony, the district court could very reasonably conclude that Ray knew he was returning to Wisconsin while in confinement and that it was strange that he would decide to mail the motion to a Wisconsin court

---

[4] (...continued)

by itself to support the district court's factual findings. *See, e.g.,* Opinion at 45-46. However, no one piece of evidence must support a factual finding; rather the court must take the entire record as a whole. *Cf. Huff v. UARCO, Inc.*, 122 F.3d 374, 385 (7th Cir. 1997) (discussing standard in a discrimination case). Thus, that individually some of the vagaries are minor is of no moment; the court should have considered all of the inferences flowing from the evidence in total. And in total, the evidence was more than sufficient to support the district court's factual findings that Ray was not credible and that Ray had not given a state post-conviction motion to Smith to mail.

from Oklahoma, especially when he supposedly couldn't get to the mailbox in Oklahoma.[5]

### b.  The Certificate of Service form.

Regarding the Certificate of Service form Ray claimed Smith had given him, the district court believed the form looked like the work product of a prisoner, noting: "The certificate bears no signatures, other than Ray's, and appears on plain white paper with no heading or other indication that it is an official prison form. It contains no space for the year of service, and contains numerous typographical errors." The court first notes that "no one testified that Ray's certificate of service was phony." Opinion at 43-44. But as explained above, the state need not prove its case with direct evidence. The court then acknowledges that the form had typos and lacked any institutional markings, but excuses those problems by noting: "[t]he typos in the document, and its lack of any distinguishing characteristics like a letterhead, were consistent with other official CCA documents, of unquestioned authenticity, that Ray introduced into evidence bearing the same defects." Opinion

---

[5]  The court responds that any normal prisoner would want to file such a critical motion without delay, to avoid any delay in his potential release from prison. Opinion at 50. If such an inference is reasonable, then it is even more reasonable for the district court to have inferred that had Ray truly filed a motion with the state court in April 2004, he would not have waited more than two years to inquire on its status.

at 43. But the district court considered the other forms and found that "[e]ven when compared to other official forms which lack an institutional heading and contain a grammatical error, the court remains convinced that in both form and content the certificate looks more like the work product of a prisoner than a prison administration." The court rejects this added finding based on its own eyeball comparison of the documents, but here the court is again improperly substituting its own judgment for the district court's.[6]

---

[6] Because the court relies on its own eyeball comparison of the two documents to reject the district court's findings, attached as Appendix A is a copy of the Certificate of Service form Ray claims he received from Smith. This form appears to have been created on a typewriter and as the district court noted, it contains nothing to indicate it is an official prison document and it contains typographical errors. A reasonable inference from the appearance of this form is that it was not a prison form provided by Smith, but rather one created by Ray. This inference becomes stronger when the Certificate of Service form is placed next to some of the letters typed by Ray which the district court also admitted into evidence and which are included as Appendices B and C. (For instance, note the use of "[ ]" instead of the more appropriate "()" in all of the documents.) Before the district court, Ray attempted to overcome the inference that he had created the Certificate of Service form by tendering *a* document he had received from the New Lisbon, Wisconsin prison (not from the CCA, as the court states). Opinion at 43. This New Lisbon form, reprinted as Appendix D, also has several typographical errors and has no official

(continued...)

Moreover, in addition to finding that the Certificate of Service looked more like a form created by a prisoner than a prison, the district court also found that Ray's testimony concerning the Certificate of Service contradicted other documentary evidence. Specifically, Ray testified that Smith had given him the Certificate of Service and that he had filled it out. But as the district court noted, Ray referenced the "Certificate of Service by Mail" form in his supposed first letter to Smith on June 1, 2004, but in that letter he stated that she had filled it out. Ray also mentioned the Certificate of Service form in his "Motion for Protective Order Staying And Abeying [sic] Petitioner's Petition for Writ of Habeas Corpus Filed Pursuant to 28 U.S.C. § 2254," and there he stated that Smith had signed the form. Ray's change in story, i.e., from his original claim that Smith had filled out the Certificate of Service form, to his current version that he had filled out the form, is significant. Had he not changed his story, the state could have shown, through handwriting analysis, that Ray had completed the form.[7]

---

[6] (...continued)

prison heading. But its font and appearance differ significantly from the Certificate of Service form. And a reasonable fact-finder could infer that this form could not be created on a typewriter by a prisoner (given the font and the use of differing font sizes—some large and some small), while the Certificate of Service form could have been.

[7] The court responds by first stating this is a minor inconsistency and then quoting *Anderson*, Opinion at 43. But, as dis-

(continued...)

### c. Testimony concerning postage.

The state also provided evidence, through the testimony of Highley, calling into question Ray's story that he gave Smith the state post-conviction motion. She testified that during the time that Ray supposedly gave Smith the state court motion for mailing, he had not purchased any postage. The court responds that the state's evidence, through testimony of Ms. Highley, that Ray did not purchase postage during April 2004 did not establish that Ray did not provide Smith with the motion because Highley "could not rule out the possibility that Ray had retained postage from earlier purchases, borrowed stamps from other prisoners, or received postage from family members or friends who were not incarcerated." Opinion at 47. It is true that during cross-examination Highley testified that she could not rule out that possibility, but it was one piece

---

[7] (...continued)

cussed above, *Anderson* is quoted out of context, *see supra* at 66 n.4, and while it is a minor inconsistency, it adds to the other inferences supporting the district court's factual finding that Ray's testimony is incredible. The court also notes "it makes no difference who technically filled out that form, so long as it demonstrates that Ray had asked Ms. Smith to mail out his motion." Opinion at 43. It is true that it wouldn't matter who filled out the form if it were truly given to Ray by Smith in response to his request to mail out the motion. But that Ray's story changed does support an inference that he is lying when he claimed that Smith had given him that form.

of evidence the district court could consider in evaluating
Ray's story. And when considered in light of other
record evidence, Highley's testimony supported the
district court's factual findings. Specifically, Ray's testi-
mony concerning the postage for the state post-conviction
motion was inconsistent with other evidence. Before
the district court, Ray testified that he used stamps for
postage on the state post-conviction motion he pur-
portedly gave Smith, stating he had some and borrowed
a few to make sure there was enough postage on
it and then gave Smith a disbursement request in case
there wasn't enough postage. However, this testimony
was inconsistent with the affidavit Ray had filed in Feb-
ruary 2007 with his petition for habeas relief: In that
affidavit, Ray stated that he "personally placed [his]
postconviction motion puruant (sic) to 974.06{4, (sic) along
with disbursement request for postage in the hands of
Tamara Smith, . . . . " Ray made no mention of having
affixed stamps to the envelope. Because Highley's testi-
mony ruled out the possibility that a disbursement was
made for stamps around the time Ray claimed to have
given Smith the motion, this change in story (i.e., Ray's
current claim that he had placed stamps on the motion)
takes on a greater significance.

### d.  Diamondback's policies.

The court also discounts the state's evidence con-
cerning the mail policies at Diamondback. First, the
court reasons that nothing in the record explains whether
the Diamondback policy that "[a]ll inmate mail will be
processed through the institutional mailroom. No person,

either staff or visitors, is permitted to bring in or take out any mail or article for an inmate," applies to prisoners while administratively confined. Opinion at 49. But the policy clearly states "[a]ll inmate mail." Moreover, Ray's testimony that he gave the motion to Smith because he could not go to the mailroom is implausible in light of his other testimony. Specifically, in explaining how he came to give the motion to Smith, Ray speaks of leaving his lunch table, going upstairs to his cell, bringing the envelope with the motion in it downstairs, and then going into a social worker's office with her. It is difficult to believe that a prisoner could roam with that much freedom and be able to walk to the social worker's office, but be unable to walk with the social worker to the centrally located mailbox or the prison mailroom.[8]

The district court also found it "noteworthy that the CCA Corporate and Facility Policy governing Diamondback does not mention either a 'Privileged Correspondence Receipt' form or a 'Certificate of Service By Mail' form, but it does specify the form to be used when privileged correspondence is distributed to an inmate." The court counters that while the prison mail policy does not mention the giving of a receipt for outgoing legal mail, the

---

[8] The court responds that without knowing how Diamondback was configured, this is pure speculation. Opinion at 42. But Ray testified that when he approached Smith to give her the post-conviction motion, he had to wait because she had to take another prisoner "somewhere in the institution." Based on this testimony, it is reasonable to infer that Smith could have likewise taken Ray to the central mailbox or mailroom.

state did not produce Smith or some other prison official to prove that forms were not given. Opinion at 47. But direct evidence is not required and Diamondback's policy addressing the handling of privileged correspondence is circumstantial evidence that supports the district court's factual findings. That policy stated that for incoming privileged correspondence "[a] staff member will distribute privileged correspondence to inmates using form 16-1D." Conversely, the policy "**AT THIS FACILITY**" for mailing outgoing privileged correspondence provided that "[a]ll outgoing legal mail is logged in at the mailroom when it is received." The district court could reasonably infer from the fact that the prison policy specified the use of a form to log incoming privileged mail and its directive that outgoing privileged mail be logged in the mailroom, that Diamondback did not give prisoners a Certificate of Service or a Privileged Correspondence Receipt form upon mailing privileged mail.

### e.  The Privileged Correspondence Receipt.

The court next attacks the district court's findings concerning the Privileged Correspondence Receipt. The district court found that it was doubtful that Ray ever had a Privileged Correspondence Receipt form signed by Smith. In response, the court conclusorily states: "Ray offered an essentially uncontested reason for his failure to produce it: the prison library or mail system lost the document after he gave it to the library staff for copying." Opinion at 44. The court then adds that: "The

only evidence remotely contradictory was the testimony that this might have been the first time during both Officer Nedbal's and Ms. Martin's tenure that a prisoner's copy request had been lost. But as Officer Nedbal and Ms. Martin confirmed, the prison would only know if the prisoner reported it to the library staff or some other prison official. So it is certainly possible that Ray's requested copies were not the first to be lost." Opinion at 44. The court continues, saying that even if Ray's Privileged Correspondence Receipt was the first to be lost, "that fact does not establish an evidentiary basis for finding that Ray manufactured the [Privileged Correspondence Receipt] or fabricated a fictitious tale about it." Opinion at 44-45. The court further reasons that Officer Nedbal and Ms. Martin "testified that prison policy required prisoners to describe in detail the documents they submit for copying and anything 'suspicious' would be reviewed by a supervisor," and that suspicious items included ones where the description did not match its content. But no one flagged Ray's submission for review. Opinion at 45. And this testimony "lent further credibility to Ray's claim that he had, but lost, a CCA receipt signed by Ms. Smith." Opinion at 45.

Far from being "essentially uncontested," the state strenuously challenged Ray's story and the district court found that "Ray's evidence that [prison officials] lost his Privileged Correspondence Receipt form [are] unconvincing." The district court explained that "[b]ased on the testimony, it is clear that the document Ray handed [Corrections Officer] Nedbal for photocopying could have been a document he created in an attempt to

manufacture additional evidence to corroborate his claim that he handed his state post-conviction motion to Smith for mailing on April 27, 2004." The district court further found "[t]he detail in which Ray described the document in the Disbursement Request form suggested a purpose beyond a simple request for a thirty-cent disbursement for photocopying." And although the form requires "detailed instructions," the librarian testified that "the detail required concerned the directions for copying, i.e., number of copies, one or two sides, legal or letter size—not the document to be copied." The district court added: "Library personnel were not expected to determine the authenticity of the documents submitted for copying. They screened the material for appropriateness and to insure it did not relate to a different inmate." Moreover, prison officials were not allowed to read legal materials—they mainly looked to ensure the name of the inmate matched the document. Based on this testimony, the district court found Ray's claim that prison officials lost the Privileged Correspondence Receipt unconvincing. This finding was amply supported by the evidence.

In response to the dissent, the court states: "[I]t takes a speculative leap to go from the mere fact that Ray described the document in the disbursement request form in a lot of detail to the conclusion that he fabricated it." Opinion at 45. The court's conclusion, though, flows from its misunderstanding of the record. Specifically, the court confuses the Disbursement Request form with the Photocopy Request form. A prisoner requesting a photocopy must complete both forms, but

it is the Photocopy Request form, and not the Disbursement Request form, which must include "detailed instructions as to what is to be copied." But it was in the Disbursement Request form and *not* the Photocopy Request form that Ray described in excruciating detail the purported Privileged Correspondence Receipt, stating:

> TWO COPIES OF A CORRECTIONS CORPORATION OF AMERICA PRIVILEGED CORRESPONDENCE RECEIPT FORM SIGNED BY CCA SOCIAL WORKER SMITH, REGARDING MY PLACING MY 974.06 MOTION IN HER HANDS APRIL 27, 2004.

And Ray typed that detailed description of the content of the purported Privileged Correspondence Receipt form in the blank entitled: "Reason for Request." The Disbursement Request form also required prisoners to state the "Individual Items Requested," and here Ray merely typed "2 Copies of CCA Form." Then in the Photocopy Request form, Ray described the form simply as: "2 copies of a CCA Mail Form Receipt/'Please' send the copies I have requested to me through the institutional mail. Thank you."

That Ray included such detail (including that the purported Privileged Correspondence Receipt form was signed by Smith and stated that he placed the state court motion in her hands on April 27, 2004), in the *Disbursement Request* form when the form merely asked for the "Reason for Request," and *not* in the Photocopy Request form, is significant for two reasons. First, and as the district court found, there is no reason to

provide such detail in the Disbursement Request which merely served to request a thirty-cent disbursement for photocopying. Second, while the librarian was responsible for reviewing the Photocopy Request form to ensure it was filled out correctly and to screen materials for copying for appropriateness, no similar review of the Disbursement Request form was required; rather, according to the library procedures (contained in the record), the librarian's responsibility was merely to authorize the Disbursement Request form indicating the correct amount charged and then route it appropriately. Officer Nedbal and Librarian Martin's testimony at the evidentiary hearing confirmed these facts. And Officer Nedbal, who approved the Disbursement Request form, said he merely "glanced at" the "Reason for Request." Later, when the librarian screened the document Ray submitted for copying, the librarian would compare that document to the general description, i.e., "CCA Mail Form Receipt," Ray put in the Photocopy Request form. Moreover, as Librarian Martin further testified, while she would merely be scanning the document and description contained in the Photocopy Request form, "[t]he person making the copies would have to read that in more detail . . . ." Ray had previously worked in the library, so he knew how the forms were processed.

The court's response to this is "the fact that librarians were not required to affirmatively verify the authenticity of documents to be copied does not create a reasonable inference that the document was therefore a fake or nonexistent." Opinion at 45. I agree. The

mere fact that a librarian was not required to verify the authenticity of the document to be copied does not create an inference that the document was therefore a fake or nonexistent. But this fact does mean that the form submitted for copying might not have been the one described by Ray in the Disbursement Request form.

Then the question is whether the other evidence allows for the reasonable inference that the Privileged Correspondence Receipt form was nonexistent or fake. And it does: Namely, the fact that Ray included the extensive details of the *content* of the document to be copied in the Disbursement Request form, but not in the Photocopy Request form, creates a reasonable inference that he did so to invent evidence to support the inference that there had once been in existence a Privileged Correspondence Request form signed by Smith stating that he had given her a state post-conviction motion for mailing in April 2004. This inference is even stronger given that in the Photocopy Request form Ray wrote "'Please' send the copies I have requested to me through the institutional mail." There was no reason for Ray to state on the Photocopy Request form that he wanted the form returned to him through the institutional mail system, absent a premeditated plan to create a paper trail to establish that the purported Privileged Correspondence Request form existed and then was "lost in the mail." First, the Photocopy Request form does not ask the prisoner to specify how he wants the photocopied materials returned. Second, the evidence creates a reasonable inference that the librarian had, in the past, personally handed Ray his completed

copies (and thus Ray needed to specify that he wanted the copies returned via institutional mail to avoid that possibility). The librarian knew about Ray's case and testified "we did lots of copies for Mr. Ray." Librarian Martin also testified that Ray had personally handed her copy requests in the past and that she usually picked up the completed copies. Ray also testified that, in the past when he had asked Librarian Martin for copies, "she screen them then she gonna make—she gonna make them, yes." Third, Ray testified that once he got his hands on the Privileged Correspondence Receipt form, his first thought was to make a copy of the document and after it was supposedly lost, he explained how important the copy was. Yet, according to the record, Ray gave Officer Nedbal the Privileged Correspondence Receipt form, Disbursement Request form, and Photocopy Request form on April 18, 2010, which was a Sunday. Besides the fact that there is no mail delivery on Sunday (and thus Ray did not immediately request a copy of it), Librarian Martin did not work on Sundays and because she needed to screen the copy requests, Ray's paperwork would need to be held until Monday when she returned. And Ray had worked in the library and he testified at length about some of the procedures related to copy requests, so he knew full well how things would be processed.[9] Thus

---

[9] Besides working in the library and thus knowing the process for making copies, Ray also testified that Librarian Martin was not there on the day he brought the forms to the

(continued...)

under Ray's version of things, he handed over possession of this extremely crucial document to Officer Nedbal so that it could be left sitting in a basket behind the library desk, as opposed to handing it personally to Librarian Martin and waiting for the copy to be made and handed back to him. And then, even though Ray recognized the importance of the purported Privileged Correspondence Receipt form, he wrote on the Photocopy Request form "'Please' send the copies I have requested to me through the institutional mail." Given the importance Ray claimed for the purported document, it is reasonable to infer that Ray took the purported Privileged Correspondence Receipt form to the library on a Sunday because he knew that Librarian Martin was not there and couldn't ask him about the form[10] or have the copy made for him while he waited; and that he requested the copies to be sent via institutional mail so that he could claim it was lost in the mail. These inferences are further strengthened when Ray's response to the purported missing Privi-

[9] (...continued)
library—only Officer Nedbal was, and he put the paperwork in a basket.

[10] That Librarian Martin might talk to Ray about the copy request if he handed it to her personally is reasonable to infer given the interest she had taken in Ray's case. She had called Ray down to the library from his housing unit to show him this court's decision on "LexisNexis." Another time, she had printed off a "bio" and the Facebook page for Ray's pro bono attorney and had given them to Ray.

leged Correspondence Receipt form is considered: Ray
filed an Information Request form seeking informa-
tion about the supposed missing form, noting that
Nedbal signed the Disbursement Form and Photocopy
Request form "verifying that the document I placed in
his hands matched what I wrote on those forms." Ray
later wrote the warden asking "for my original copy of
the CCA form to be found and returned to me as soon
as possible *or be provided with a copy of the memo that
Mr. Lines sent to staff about this matter, so I could forward the
e-mail to my attorney, so he could prove that the copies alone
[sic] with the original copy was some how missed placed [sic] or
given to the wrong inmate.*" (Emphasis added.) Taken
together, all of this evidence adds up to create a very
reasonable and natural inference that Ray had written
a detailed description in the Disbursement Request
form because he knew no one would review the detail
contained in that form and then he requested the copies
be returned through the prison mail system so that he
could feign their disappearance and later use the prison
forms as evidence that he had a Privileged Cor-
respondence Receipt form signed by Smith which
verified the purported mailing of the April 27, 2004
state post-conviction motion. This conclusion is not a
speculative leap, but rather is based on the reasonable
inferences flowing from the various pieces of record
evidence, which when put together form a pretty clear
mosaic showing what happened.

Moreover, it wasn't just that Ray provided a detailed
description of the supposed *content* of the purported
Privileged Correspondence Receipt in the Disbursement

Request form. Also Ray's strange request to have this important form returned through the prison mail system, and then its inexplicable disappearance, create an inference that the form never existed. There are several additional pieces of evidence which, when taken together, further create a reasonable inference that there was no Privileged Correspondence Receipt. In fact, the totality of the evidence makes Ray's entire story utterly implausible. First, as the district court explained, Ray had *never* mentioned the Privileged Correspondence Receipt in *any* of his documentation until April 18, 2010. And that was only after this court had granted his habeas petition on the merits, but remanded to the district court for a determination on whether the petition was timely. Yet Ray had specifically referenced the "Certificate of Service by Mail" form in his first purported letter to Smith on June 1, 2004, and in his "Motion for Protective Order Staying And Abeying [sic] Petitioner's Petition for Writ of Habeas Corpus Filed Pursuant to 28 U.S.C. § 2254," which he filed with his habeas petition on February 28, 2007. Ray even noted in bold that he had attached a copy of the Certificate of Service to his motion (and stated that it was signed by Smith). Ray also attached copies of the three letters he claims he sent to Smith asking her to confirm that she had mailed his motion to the state court. The district court aptly stated the absurdity of this: "Yet, he failed to even reference the one document [the Privileged Correspondence Receipt] which supposedly corroborated his account that bore someone's signature other than his own." The district court reasonably inferred from the

evidence that because Ray knew the importance of mentioning the Certificate of Service by Mail form in the court filings, he surely would have also mentioned the Privileged Correspondence Receipt if one had truly existed.[11]

---

[11] The court's response: This evidence "is simply insufficient to jump to the conclusion that the receipt must therefore not exist." Opinion at 46. But Ray's failure to *ever* mention the supposed Privileged Correspondence Receipt through years of litigation and the fact that his first mention of the form came only after this court held that his constitutional rights had been violated, creates a very reasonable inference that there was no such receipt in the first instance. This is not jumping to conclusions but using inferential reasoning from the evidence presented. *See United States v. An Article of Device,* 731 F.2d 1253, 1262 (7th Cir. 1984) ("[T]he reasoning process normally begins with known facts which form the basis for inferred facts from which further inferences can be drawn. So long as the finder of fact is reasonably certain of a preliminary inference, it is not unreasonable to use that inference as the basis for further reasoning.") (internal quotation omitted); *Wisconsin Memorial Park Co. v. C.I.R.,* 255 F.2d 751, 753 (7th Cir. 1958) ("Frequently the ultimate issue is resolved as the result of drawing inferences from the evidence received during the trial. Trust in inference is simply the belief that if there is a firm basis for the starting point the derived judgment is acceptable. The difference between speculation and inference lies in the substantiality of the evidence constituting the premise. Inductive reasoning claims the premises constitute some evidence for the conclusions and in law we speak in terms of the probability and likelihood that the

(continued...)

There is more, though. The district court also found that Ray's explanation for his failure to mention the "Privileged Correspondence Receipt" form earlier is inconsistent and not plausible. The district court explained that Ray had "testified that another inmate who was helping him had it in his possession when he was transferred to a different institution, and it wasn't until later (he's not sure when) that it was returned to him." And Ray claimed he did not understand federal habeas law or the significance of the form, but Ray was well-versed in legal proceedings. The district court added that the fact that Ray "noted in bold in a motion filed contemporaneously with his petition that the 'Certificate of Service' was signed by 'Tamara Smith,' shows that he knew the importance of a document signed by someone on the prison staff." And even if one accepts his testimony that he allowed one of his inmate helpers who was later transferred to a different institution to retain possession of such a crucial document, nothing prevented him from at least mentioning it in one of his previous filings.

Ray's failure to mention the Privileged Correspondence Receipt form until after this court remanded the case to

---

[11] (...continued)

premises buttress the conclusions.") The court's response also wrongly considers this fact in isolation, without reference to the several other facts which similarly created an inference that there never was a Privileged Correspondence Receipt.

the district court is extremely suspect. But Ray's excuse for not mentioning it earlier presents an even greater implausibility in Ray's entire story than the district court recognized. Here, the district court misread the record when it stated that Ray had testified "that another inmate who was helping him had it in his possession when he was transferred to a different institution, and it wasn't until later (he's not sure when) that it was returned to him." Actually, Ray testified on direct examination, under questioning from his own attorney, that once the Seventh Circuit's opinion came down in April, he "started trying to reach out trying to find the inmate who was transferred from the institution with my receipt." Ray further testified: "I was trying to get a copy for me and to mail you the original." So, even though Ray was now represented by very competent attorneys, we are supposed to believe that after reading the April 1, 2010 opinion, he took it upon himself to track down the form. Ray's attorney even acknowledged he was out of the loop, stating in his closing argument that "quite frankly, when I found out what had happened [with the Privileged Correspondence Receipt] I was livid because I would have driven to Wisconsin myself to pick that form up and provide it to the Court."[12]

---

[12] The court concludes that it is not unusual that Ray would attempt to track down the Privileged Correspondence Receipt himself, rather than elicit help from his attorney, stating "attorney-client communication is neither quick nor easy (continued...)

The absurdity is even more obvious when the timing of everything is considered. Ray testified that the prisoner was transferred to another prison with the Privileged Correspondence Receipt form while helping Ray with his habeas petition, and that he (Ray) did not have the Privileged Correspondence Receipt at the time that he filed his habeas petition. Ray filed the habeas petition in February 2007, which means that under Ray's version of events, he lost possession of the form sometime before February 27, 2007. It was April of 2010—more than three years later—when Ray "started trying to reach out trying to find the inmate." Even if Ray began that search immediately (Thursday, April 1, 2010), that would have given Ray only 18 days to get the Privileged Correspondence Receipt back, since Ray supposedly dropped it off for copying on Sunday,

---

[12] (...continued)

when the client is in prison and can be transferred at any time with little notice if any to the attorney, further delaying communication." Opinion at 46. That explanation might make sense if Ray were attempting to gather evidence located within the same prison. But, as noted above, Ray needed to track down a prisoner who had been transferred to another prison more than three years previously. If communications between a prisoner and his attorney are neither quick nor easy, as the court infers, it is entirely reasonable to infer that an overly eager prisoner would solicit help from his attorney to track down a prisoner in another unknown prison (also subject to a transfer to a new prison), because communications between such prisoners would be even slower and more difficult.

April 18, 2010. Within those eighteen days, then, we are
supposed to believe that Ray was first able to track
down the other prisoner, even though that prisoner
had been transferred more than three years previ-
ously. That by itself would be a challenge given that in
the two years surrounding Ray's litigation, Ray himself
was transferred to five different prisons.[13] And
remember Ray was the one "reaching out"—he didn't say
that he asked his top-notch attorneys for help, and if
his attorneys were the ones tracking down the former
prisoner, they never would have suggested that the
form be mailed to Ray who was still in prison. Then
Ray would have us believe that he was able to communi-
cate with that prisoner; and that that prisoner still had
a copy of his Privileged Correspondence Receipt from
more than three years ago. And we are to further believe
that that prisoner was able to send the document to
Ray—leaving one prison and thus undergoing the delay
caused by any screening procedures—and then be
received at Ray's prison, clear screening and be
delivered to Ray. All of this in eighteen days, which

---

[13] In April 2004, Ray was transferred from Diamondback to
Green Bay and then in May 2005 from Green Bay to Dodge;
followed by a transfer from Dodge to Columbia and then in
February 2006, from Columbia to New Lisbon. Other
than Diamondback, the other prisons were all located in
Wisconsin.

included three weekends.[14] And then the prison conveniently lost it! This story is utterly unbelievable.

### f.  Ray's knowledge of habeas law.

The final aspect of the district court's reasoning that the court attacks is the district court's finding that Ray's assertion that he did not understand the law governing habeas corpus is not plausible. The court reasons that there was no evidence to support the district court's branding Ray a sophisticated prison litigant.

---

[14] The court admits that this conclusion is "not without force," but then says that "unfortunately for the state, it did not actually produce any evidence to support it." Opinion at 46. However, this conclusion is proven by Ray's testimony. Specifically, as detailed above, Ray testified that once the Seventh Circuit's opinion came down in April, he "started trying to reach out trying to find the inmate who was transferred from the institution with my receipt." Thus, according to Ray's own testimony, he neither had the purported Privileged Correspondence Receipt form on April 1, nor knew the location of the prisoner who supposedly had it. And then Ray claimed he sent that form for copying on Sunday, April 18, 2010. Thus, under Ray's own version of events, as he testified to at the evidentiary hearing, the Privileged Correspondence Receipt form was retrieved within eighteen days. It is more than reasonable to infer from the sheer implausibility of this timing that Ray made the whole thing up, especially in light of the delay and difficulty prisoners face when trying to communicate with their own attorneys, as the court itself infers. *See* Opinion at 46.

Opinion at 50. The court first criticizes the district court's statement that Ray had two or three boxes of legal materials when he was at Diamondback. The court then rhetorically asks: "Were these small shoe boxes or large moving boxes? Were they filled with distinct documents or multiple drafts or copies of only a handful unique ones?" before concluding "[t]he record does not say." Opinion at 47.

The court, though, gives short shrift to the district court's other reason for rejecting Ray's claim that he did not understand the law governing habeas corpus. Ray had testified before the district court that when he wrote the state court on October 4, 2006, to inquire on the status of the post-conviction motion, he knew nothing about federal habeas law and had talked to no one about it. The district court explained that "Ray's initial filing in the district court came less than six months after he claims he first became aware that his original state post-conviction motion was not filed in state court and that filing demonstrates his 'detailed knowledge of not only the one-year limitation period for federal habeas petitions, but also the mailbox rule and the rules governing tolling of the one-year period.'"

In fact, though, the record is even more damning than what the district court found. While Ray filed his habeas petition in February 2007, Ray dated the signature line of the *pro se* Petition for Protective Order Staying and Abeying (sic) Petitioner's Writ of Habeas Corpus, which accompanied his habeas petition, November 27. (And since Ray filed the Petition in Febru-

ary 2007, November 27 must be November 27, 2006.) Ray signed that document less than two months after he sent the letter to the state court inquiring about his supposed missing post-conviction motion. In Ray's *pro se* Petition for Protective Order Staying and Abeying (sic) Petitioner's Writ of Habeas Corpus, Ray demonstrated his extensive knowledge of habeas law, including the one-year statute of limitations, the mailbox rule, and tolling principles. (Attached as Appendix E is that *pro se* petition so that there is no question of the depth of Ray's knowledge.) Thus Ray clearly knew the importance of showing that he had given the state post-conviction motion to Smith for mailing on April 27, 2004, around the time he wrote to the Wisconsin state court. Given Ray's detailed knowledge of habeas law in November 2006, it is reasonable to infer that Ray had similarly detailed knowledge in October 2006, at the time he wrote the state court to supposedly inquire about the status of his state court petition.[15]

---

[15] The court states that "[i]t is not implausible that Ray would obtain a working knowledge of habeas in two months, especially after the need for such knowledge took on increased urgency when he learned that his state motion was never filed." Opinion at 48. While it might be plausible that Ray obtained working knowledge of habeas law in two months, it is equally plausible to infer that Ray had that knowledge in October of 2006 when he wrote the letter to the state court. And given the totality of the evidence in this case indicating that Ray concocted the entire story about giving the state post-conviction motion to Smith, this inference was more than reasonable.

### 4. The state's theory that Ray manufactured evidence.

The court's last main rationale for rejecting the district court's factual findings seems to be its view that the only way to find Ray's testimony not credible is to believe that Ray "concoct[ed] a sophisticated scheme in October 2006 to assert a mailbox rule claim and avert AEDPA's one-year time bar." Opinion at 48. The court reiterates that view later, stating: "The state's argument requires us to believe that Ray knew in 2004 that the mailbox rule would apply to a section 974.06 post-conviction motion filed in Wisconsin, even when the motion is not received by the state court—issues that we decide today as a matter of first impression." Opinion at 50.

The state's theory requires nothing of the sort. Rather, all we need to believe is that on October 4, 2006, Ray knew that he could not pursue habeas relief unless he had given a state post-conviction motion to a prison official within the one-year statute of limitations.[16] And

---

[16] There was also no need for Ray to foresee this court's holding that the mailbox rule applied to a state post-conviction motion because Ray wasn't relying on that theory but on the theory of equitable tolling. In this regard, the court is also wrong to say: "But Ray does not argue that he diligently followed up with the state court during the two years that passed from the time he allegedly gave Ms. Smith his motion to the time he filed his second, supplemental motion." Opinion at 51. Actually, though, Ray did argue that he had been dili-

(continued...)

Ray undisputedly had that knowledge on November 27, because that is the date on the signature line of his signed *pro se* "Motion for Protective Order Staying And Abeying [sic] Petitioner's Petition for Writ of Habeas Corpus Filed Pursuant to 28 U.S.C. § 2254."[17] Everything else could have easily been back-filled: Ray could have created the letters he claimed to have mailed to Smith, as

---

[16] (...continued)

gent. In the affidavit he filed along with his *pro se* habeas petition, Ray stressed that he had written Smith on June 1, 2004, September 9, 2004, and June 15, 2005, and then again after he learned his state court motion had not been filed; he also added that he had then also written the prison warden. Ray then concluded that he "need only show that an 'extra-ordinary circumstances' (sic) beyond control of prisoner for application of equitable tolling to obtain the necessary federal habeas review and he demonstrated due diligence in trying to rectify the matter." It was only after counsel was appointed that the theory of equitable tolling was abandoned. But equitable tolling was Ray's theory back in October 2006 when he sent the letter to the state court inquiring on the status of his post-conviction motion. This also explains why Ray would bother to send a letter to Smith and the warden after he "learned" that the state court had not received his letter—to bolster his claim of diligence.

[17] In support of his Motion for Protective Order, Ray also submitted an undated affidavit, which argued that there were "extraordinary circumstances" beyond control of prisoner for application of equitable tolling to obtain the necessary federal habeas review. This affidavit also illustrated Ray's knowledge of the tolling principle.

well as the Certificate of Service, and then merely dated them 2004. Similarly, it wouldn't take much to come up with the idea of pretending the prison lost a "Privileged Correspondence Receipt" during copying.

Moreover, contrary to the court's conclusion that "without evidence there is no basis for believing" Ray concocted a scheme to avoid the statute of limitations, there is ample circumstantial evidence that Ray invented the April 27, 2004, mailing and the "loss" of the "Privileged Correspondence Receipt." Much of this evidence was discussed above. But there is still more. For instance, the only document Ray had notarized was the October 4, 2006, letter he sent to the Wisconsin state court inquiring on the status of the motion he supposedly gave Smith in April 2004. When asked why he notarized the letter, he said "Because it's a court document—it's going to the court. It's like a court document." But this was merely a *letter* and he wanted it notarized. Yet he didn't attempt to have the state post-conviction motion notarized. His explanation makes no sense and the existence of the notary seal on the October 4, 2006 letter to the Wisconsin court shows that Ray was completely aware of the significance of that letter and this supports the factual finding that Ray manufactured documentation to support a non-existent state post-conviction motion.

Additionally, the district court reasoned that Ray's lack of diligence in following up with the state court clerk about the post-conviction motion he purported to file in April 2004, until October of 2006, also supports

the idea that Ray made up the supposed April 27, 2004, motion. I agree. Had Ray truly filed a motion with the state court in April 2004, he would not have waited more than two years to inquire on its status. *See Allen*, 471 F.3d at 1198 ("The district court may take into account any and all relevant circumstances, including any lack of diligence on the part of Allen in following up in a manner that would be expected of a reasonable person in his circumstances, in deciding whether the notice was delivered to the prison authorities.").[18] Ray tried to explain away his lack of diligence by saying that he was told by other prisoners not to bother the court. But as the district court also aptly noted, at the very least Ray would have had to contact the state court to let it know he had been trans-

---

[18] Not only does *Allen* support the conclusion that it is reasonable to infer that Ray never gave Smith a state post-conviction motion from the fact that he didn't inquire on the filing for more than two years, the court's own reasoning demonstrates that this is a reasonable inference. In explaining why a prisoner might mail a state post-conviction motion from Oklahoma to a Wisconsin court, even though he knew he was being transferred to Wisconsin, the court reasons that a normal prisoner would not delay filing "such a critical motion (and consequently, delay his potential release from prison), for an indefinite period of time, . . . ." Opinion at 50. Similarly, it is reasonable to infer "a normal prisoner" would not delay inquiring on such a critical motion for more than two years.

ferred.[19] And Ray was trans-ferred not just once, but four times between the supposed mailing of the motion in April 2004 and the first time Ray contacted the state court to inquire of his petition in October 2006. *See supra* at 88 n.13.

Moreover, the district court found implausible Ray's claim that he sent three letters to Smith in an effort to confirm she mailed the motion to state court. Besides noting that there was no way to tell from the ap-pearance of the letters whether Ray mailed them, the district court also found it curious that Ray would retain a copy of a letter he supposedly sent to Smith only a month after he handed her his state motion, but did not keep a copy of the motion itself. The district court added that it was also curious that Ray stated in an af-fidavit that he also wrote Diamondback regarding his

---

[19] The court characterizes Ray's failure to notify the state court of his prison transfers as "Ray's shortcomings as a pro se litigant" Opinion at 46, which is "simply insufficient to jump to the conclusion that the receipt must therefore not exist." Opinion at 46. But under Ray's version of things, he was concerned enough about the status of his motion to ask other prisoners what to do. And it is more than reasonable to infer from that fact that even a *pro se* litigant would at that point contact the court to notify the court of his prison transfers—not as a matter of civil procedure, but to assure that he received notice of what was happening to the motion. Like-wise, it is reasonable to infer that Ray did not contact the court, even to notify it of his transfers, because he had never filed a motion with the court.

lost property on the same dates that appear on his letters to Smith, but Ray couldn't remember if he kept a copy of those letters. The district court was right that these inconsistencies all rendered Ray's story questionable. It is also unbelievable that even though Ray heard nothing from Smith in response to his purported June 1, 2004, letter, he would continue to write to her on September 9, 2004, and then even after he had not heard anything from Smith for over a year, he wrote to her a third time on June 15, 2005. And, then, after writing to the state court and supposedly learning for the first time that the motion was not filed, Ray claimed again that he wrote to Smith—from whom, under his version of events, he had never received a response—and also the prison warden, to find out what happened to his petition.[20] It is utterly unbelievable that a prisoner would continue such a letter-writing campaign, absent a desire to give credence to his earlier story that he had given Smith the petition.

In the end, yes, we have to believe that Ray concocted a story—but the evidence taken as a whole overwhelmingly supports, perhaps even compels, that finding. It is also not nearly the sophisticated scheme the court thinks it is and it also didn't have to start back in 2004,

---

[20] In both his letter to the warden and his fourth supposed letter to Smith, Ray stated that he had given Smith the post-conviction motion on April 29, 2004. In all of the other documents, and in his testimony before the district court, Ray stated he had given Smith the motion on April 27, 2004.

but rather could have been hatched just a few months before Ray turned to federal court for habeas relief.

## III.

As noted, the court holds that the district court's factual findings (that Ray was not credible and that Ray had not given Smith a state post-conviction motion for mailing on April 27, 2004) were clearly erroneous. In reaching this conclusion, though, the court gives only passing mention to many of the inconsistencies and implausibilities in Ray's story and his supposedly supporting documentation which the district court relied upon to justify its findings. But contrary to the court's attempts to downplay those inconsistencies and implausibilities, they all did call Ray's story into question. And two aspects of Ray's story were so unbelievable that alone they justify the district court's factual findings: (1) Ray's claim of ignorance of habeas law on October 4, 2006, when he wrote to the state court, when just the next month he signed a habeas petition that *detailed* habeas law, the statute of limitations, the prisoner mailbox rule, and the principle of tolling; and (2) Ray's claim that he never mentioned the "Privileged Correspondence Receipt" form in his habeas petition or other earlier documentation because the prisoner who had been helping him with his habeas petition had been transferred to another prison with that form and then later that that form was lost. That would require, in eighteen days, Ray (and not his attorneys) to be able to track down the other prisoner who would still have a copy of the form

from more than three years, and have the form success-
fully mailed out of one prison system and delivered
into another, and once retrieved, lost in the prison mail.

While I believe these two implausibilities alone are
sufficient to affirm the district court's factual findings,
there were many other inconsistencies and implausi-
bilities relied upon by the district court in reaching its
finding that Ray was not credible and that Ray had not
given a state post-conviction motion to Smith on April 27,
2012. The court downplays or ignores these, but taken
together they all demonstrate that the district court's
finding that Ray was not credible and that Ray had
not given Smith a state post-conviction motion for
mailing on April 27, 2004 was well-supported by the
evidence. *See, e.g., Anderson*, 470 U.S. at 575 ("Documents
or objective evidence may contradict the witness' story;
or the story itself may be so internally inconsistent
or implausible on its face that a reasonable factfinder
would not credit it.").

I regret consuming everyone's time in laying out the
minutiae of the record. But given the court's conclusion
that the district court committed clear error in finding
Ray incredible and in finding that he did not give Smith
the state post-conviction motion on April 27, 2004, it is
necessary to detail the many, many inconsistencies,
contradictions, and omissions in Ray's story, in addition
to highlighting the sheer implausibility of several
aspects of Ray's story in light of the record. As these
details show, Ray's problem with the district court was
not that the district court branded him a liar. Rather,
Ray's problem is that the district court reviewed all of

the evidence and heard Ray testify in person and after this evidentiary hearing found that he was a liar. This conclusion was not based on improper speculation, but on the totality of the reasonable inferences flowing from the record evidence.[21] A thorough review of the cold record verifies this assessment. But in addition to the record, the district court had the benefit of watching Ray's demeanor and hearing him try to explain away all of the inconsistencies, vagaries, and implausibilities of his story. Our court should not substitute its judgment for the district court's and by doing so at such great lengths today it creates dangerous precedent in general, and even more dangerous precedent when the prisoner mailbox rule is at issue and the court shifts the burden of

---

[21] *Grepke v. General Elec. Co.*, 280 F.2d 508, 511-12 (7th Cir. 1960) (quoting *Lavender v. Kurn*, 327 U.S. 645, 643 (1946) (" 'It is no answer to say that the jury's verdict involved speculation and conjecture. Whenever facts are in dispute or the evidence is such that fair-minded men may draw different inferences, a measure of speculation and conjecture is required on the part of those whose duty it is to settle the dispute by choosing what seems to them to be the most reasonable inference. Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear. But where, as here, there is an evidentiary basis for the jury's verdict, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion. And the appellate court's function is exhausted when that evidentiary basis becomes apparent, it being immaterial that the court might draw a contrary inference or feel that another conclusion is more reasonable.' ").

proof to the state solely on the basis of a prisoner's affidavit. Therefore, while I concur in the court's holding that the prisoner mailbox rule applies to Wisconsin post-conviction filings, I dissent from the court's holding that the state bore the burden of proving Ray had not given Smith a state post-conviction motion for mailing on April 27, 2004, and from its further holding that the district court committed clear error in finding that Ray had not given the motion to Smith.

## APPENDIX A

Case: 11-3228    Document: 9-1    Filed: 12/09/2011    Pages: 199

CERTIFCATE OF SERVICE BY MAIL

The undersigned hereby certifies that he is the "pro se" litigant in this action, and is a person of such age and discretion to be competent to serve papers.

That on this /Apr day of ___27___, he did serve a copy of the enclosed documents in the case of ___974.86(4)___, Case No. ___00-CF-001684___:

By placing said copies in the hands of ___Jamar Smith___ prison official with at Diamondback Correctional Facility first-class postage prepaid, addressed to the person hereinafter named at the placed and address hereinafter stated, which is the last known address of said person. Address: Milwaukee County Court.
         949. N 9th St
         Milwaukee, Wis 53233

I hereby certify pursuant to CATER V. CLARK, 616 F. 2d 228 [5th Cir. 1980], under the penalty of perjury that the foregoing is true and correct to the best of my personal knowledge, believe and experience, that there is no notary public presently available to me, and that the foregoing declaration is in substantial compliance with Title 28 USC 1726.

Respectfully mailed,

Elliot Ruy

Case 1:07-cv-00190-WCG   Filed 02/28/07   Page 7 of 19   Document 3

## APPENDIX B

Case: 11-3228      Document: 9-1      Filed: 12/09/2011      Pages: 199

June 15, 2005

Dear Mrs. Smith,
This is the third "PRIVLEGED CORRESPONDENCE" Ihave sent to you
regarding my "POSTCONVICTION RELIEF PURSUANT TO 974.06[4] MOTION
Ipersonally placed in your hands on April27,2004. Ihave yet to receive
anything from the Milwaukee County Clerk informing me that said motion
wasreceived and filed. Can you please inform me what happen to said
motion once Iplaced it in your hands. Tthis is a very inportant matter
so Ituly need to hear foom you.

Elliot Don Ray#363852
Clumbia Correctional Inst.
Po box 950
Portage, Wis 53901

## APPENDIX C

*Our records do not show any motion filed in 2004*

Case: 11-3228    Document: 9-1    Filed: 12/09/2011    Pages: 199

STATE OF WISCONSIN CIRCUIT COURT MILWAUKEE CO.

STATE OF WISCONSIN,

        PLAINTIFF,

VS.                        CASE NO. 00-CF-001684

ELLIOT DON RAY,

        DEFENDANT,

   DEAR CLERK,

     IAM writing you seeking information, about the current status of my postconviction relief pursuant to 974. 06[4] Wis. stats. that I mailed out in APRIL of 2004.

     THANK YOU FOR YOUR TIME AND CONSIDERATION. IT IS VERY MUCH APPRECIATED.

   ELLIOT D. RAY 363862
   P.O. BOX _4000
   NEWLISBON, WIS 53950

*Elliot D. Ray*

cc: FILE

State of Wisconsin
County of Juneau

Subscribed and sworn/affirmed to before me this 04 day of Oct 20 06 by Elliot D Ray

Stephanie Flint
Notary Public

My Commission Expires: 12/07/08

Case 1:07-cv-00190-WCG   Filed 05/28/07   Page 5 of 19   Document 3

SA-141

## APPENDIX D

Christopher
Fullove
403375

Case: 11-3228      Document: 9-1      Filed: 12/09/2011      Pages: 199

### TLU PROPERTY REQUEST

When placed in segregation under Temporary Lockup (TLU) you will be provided an opportunity to request specific items from your personal property, which are deemed as allowable in segregation. In order to do so, you must complete this form, indication what items you desire to have. The Segregation Property Officer will generally fill these orders, unless occurring on the weekends of holidays. Generally, you should forward any requests\concerns regarding your property to the Segregation Property Officer. Once you are out of items from this list, you can order additional from canteen.

Name: ELLIOT D. RAY          Inmate Number: 32-3862

Housing Unit: B-Wing                    8/07/10
                                        Kratley

Seg Cell Number: 28

Date of Request: 8-8-10

- ☑ CHAPSTICK
- ☑ SHAMPOO
- ☐ CONDITIONER
- ☑ DEODORANT
- ☐ SHAVING CREAM
- ☐ SKIN LOTION
- ☑ BAR SOAP
- ☑ SOAP DISH
- ☑ TOOTH BRUSH
- ☑ TOOTH BRUSH HOLDER
- ☑ TOOTHPASTE

- ☐ ADDRESS BOOK
- ☐ CARBON PAPER
- ☐ DICTIONARY, SOFT COVER
- ☑ STAMPS
- ☐ MANILLA ENVELOPES; NO METAL
- ☑ STAMPED OR BLANK ENVELOPES
- ☐ WRITING PAPER
- ☑ GREETING CARDS
- ☑ PERSONAL CARDS & LETTERS
- ☐ CALENDER
- ☑ PHOTOS
- ☐ LEGAL MATERIAL, metal removed

- ☐ ANTI FUNGAL CREAM
- ☐ TYLENOL
- ☑ ASPIRIN – meal cart
- ☐ COUGH DROPS

- ☐ PLAYING CARDS
- ☐ EYE GLASSES WITH CASE
- ☐ HARD CANDY
- ☑ RELIGIOUS TEXT
- ☐ EAR PLUGS

- ☐ DENTURE ADHESIVE
- ☐ DENTURE CASE
- ☐ DENTURE CLEANER
- ☐ DENTURES
- ☑ SHOWER TONGS

- ☐ HAIR PICK
- ☑ COMB OR BRUSH

STAFF CONTROLLED ITEMS
- ☐ TOENAIL CLIPPERS
- ☐ FINGERNAIL CLIPPERS

Specific Legal Material Requested          Thank you in Advance!

and Mt 303.

EXHIBIT
21

Ray Ex 21

APPENDIX E

Case: 11-3228      Document: 9-2      Filed: 12/09/2011      Pages: 143

U.S.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

'07 FEB 28 AII :42

ELLIOT RAY,

              Petitioner,

JON W. SARFILIPPO
CLERK

v.                                          Case No: 00-CF - 001684

TIM LUNDQUIST, Warden,
New Lisbon Correctional Institution
P.O. Box 4000 - New Lisbon, WI 53950

07-C-0190

              Respondent.

### PETITION FOR PROTECTIVE ORDER STAYING AND ABEYING PETITIONER'S PETITION FOR WRIT OF HABEAS CORPUS FILED PURSUANT TO 28 U.S.C. § 2254

State prisoner petitioner ELLIOT RAY submitted for filing this date a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 and now submits this petition seeking a 'protective' order to stay and abey that habeas corpus petition with this Courts permission to amend current petition upon the exhaustion of state remedies.

Petitioner-Ray offer the following grounds in support of this motion:

ANNOTATION:

Wis. Adm. Code s ATCP 1.13

WISCONSIN ADMINISTRATIVE CODE
AGRICULTURE, TRADE & CONSUMER PROTECTION
CHAPTER ATCP 1. ADMINISTRATIVE ORDERS AND CONTESTED CASES
SUBCHAPTER IV. GENERAL PROVISIONS

Current through Reg. No. 607 (July 2006)

ATCP 1.13 Documents; filing, identification and service.

(3) FILING DEADLINES. If a party is required to file a document on or before a specified date, the party complies with the filing deadline if the party mails the

1

Case: 11-3228     Document: 9-2     Filed: 12/09/2011     Pages: 143

document on or before the deadline date.

(c) If any party claims not to have received a copy of any document filed under par.
(a), an affidavit of mailing constitutes presumptive proof of service.

¶1.     Petitioner-Ray asserts that his postconviction motion pursuant to *Wis. Stat. § 974.06* was somehow lost, misplaced of simply not forwarded to its requested destination.

¶2.     Petitioner-Ray has a duplicate postconviction motion pursuant to *Wis. Stat. § 974.06* pending in the Wisconsin Court of Appeals. A *§ 974.06* motion may not raise claims that could have been raised on direct appeal, absent a showing of "sufficient reason" for the initial failure either to allege or adequately raise the claims previously. *Wis. Stat. § 974.06(4); State v. Lo,* 2003 WI 107, ¶ 31, 665 N.W.2d 756.

¶3.     As Petitioner-Ray's reason for not raising his unexhausted claims in state court, Ray asserts that his postconviction counsel (as opposed to appellate counsel) are properly raised in *Wis. Stats. § 974.06* motions, and Wisconsin courts have been willing to find a claim of ineffective assistance of postconviction counsel as a "sufficient reason" for the failure to raise claims in previous motion. *State ex rel. Rothering v. McCaughtry,* 556 N.W.2d 136, 138-39 (Ct. App. 1996).

¶4.     The Antiterrorism and Effective Death Penalty Act of 1996 requires a state prisoner seeking federal habeas relief to file his petition within one year after his state conviction becomes final, *28 U.S.C. § 2244(d)(1)(A),* but excludes from that period the time during which an application for state collateral review is "pending," *§ 2244(d)(2).*

¶5.     The Wisconsin Supreme Court issued its order denying Mr. Ray's Petition for Review on June 12, 2003. Because Ray did not seek Certiorari in the United States Supreme Court, his one-year filing period began to run 90-days later, after the time for seeking certiorari review expired. *Anderson v. Litscher,* 281 F.3d 672, 674 (7th Cir. 2002). This was September 12, 2003, and Ray's filing period would have expired a year later, on September 12, 2004.

¶6.     Ray, however, filed a postconviction motion pursuant to § 974.06 Wis Stats. on April 27, 2004 pursuant to the prison mailbox rule set forth in *Artuz v. Bennett,* 121 S.Ct. 361 and unitl the State proceeding related to this motion are completed, the statue of limitation is stayed. § 2244(d) (2). Problematically, two days after he deposited his 976.06 motion in Diamondback Correctional Facility's staff [Tamara Smith] possession for mailing. Ray, a Wisconsin inmate, who was housed in a corrections facility in Oklahoma, was transferred back to Wisconsin.

¶7.     On September 18, 2006, by writing to a clerk of court in Milwaukee County, asking the status on his pleading. Ray became aware that his motion pursuant to § 974.06 Wis. Stats. was never filed. Nontheless, Ray's motion was filed back on April 27, 2004, "at the time petitioner delivered it to the prison authorities for forwarding to the court clerk." *Houston v. Lack,* 487 U.S. at 276, 108 S.Ct. 2385 101 L.Ed.2d 245 (1988) (footnote omitted). See, e.g., Jones v. Bertrand, 171 F.3d 499, 502 (7th Cir.1999) (concluding that the "Houston mailbox rule

2

Case: 11-3228     Document: 9-2     Filed: 12/09/2011     Pages: 143

should be extended to collateral attacks, and, for statute of limitations purposes, a petition is deemed filed when given to the proper prison authorities and not when received by the district court clerk"). After several unseccessful attempts to contact prison officials at Diamondback Correctional, Ray filed a duplicate 974.06 motion which is pending in state court.

¶8       As such, to aviod any further untimeliness, Ray asked the district court for the Eastern District of Wisconsin for a protective order staying and abeying his petition for writ of habeas corpus until he concludes this pending action. The idea is that the prisoner is entitled to one clean shot at establishing his entitlement to relief in a federal habeas corpus proceeding. *Dahler v. United States*, 259 F.3d 763, 764 (7th Cir.2001); Ching v. United States, 298 F.3d 174, 177 (2d Cir.2002); *Haro-Arteaga v. United States*, 199 F.3d 1195, 1197 (10th Cir.1999). "[T]he writ of habeas corpus plays a vital role in protecting constitutional rights", and "[d]ismissal of afirst federal habeas petition is a particularly serious matter, for that dismissal denies the petitioner the protections of the Great Writ entirely, risking injury to an important interest in human liberty." *Lonchar v. Thomas*, 517 U.S. 314, 324, 116 S.Ct. 1293, 134 L.Ed.2d 440 (1996); see also *Slack v. McDaniel*, 529 U.S. 473, 483, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000).

¶9.      Ray asserts that he has not deliberately engaged in abusive litigation tactics or intentional delay to prolong the one-year statue of limitations under the Antiterrorism and Effective Death Penalty Act (AEDPA), and the claims pending in state court are potentionally meritorious. Ray pursued his state-court remedies efficiently and responsibly, and his conduct meets the "reasonable diligence" standard set forth in *Valverde v. Stinson*, 224 F.3d at 131 (2000).

PLEASE NOTE THAT RAY HAS ATTACHED A COPY OF VARIOUS LETTERS AND A COPY OF THE "CERTIFICAT OF SERVICE" WITH THIS MOTION. THE CERTIFICATE OF SERVICE WAS SIGNED BY TAMARA SMITH, SOCIAL WOTKER FOR DIAMOPNDBACK CORRECTIONAL FACILITY WITH THE TYPEWRITTEN DATE OF APRIL 27, 2004.

### CONCLUSION

*UPON THE FOREGOING*, Petitioner-Ray respectfully request that this Court stay and abey the accompany petition with the Court's permission to amend said petition upon the completion of pending state motion.

DATED THE 27th of November

Elliot Don Ray # 363862

NewLisbon Correctional Inst.
P.o. Box 400
NewLisbon, Wis 53950

3

SA-227